THE UNIVERSITY of MISSISSIPPI | OFFICE OF EQUAL OPPORTUNITY & REGULATORY COMPLIANCE

**CONFIDENTIAL**

EXHIBIT "12"

Date: 06/06/2024
Department: Office of Research and Sponsored Programs
Respondent: Renita Gray
Complainant: Ventez Jones
Allegations: Discrimination – Race and Gender

**Complaint:**

After a series of conversations with the Office of Equal Opportunity and Regulatory Compliance, Ventez Jones, Research Administrator III in the Office of Research & Sponsored Programs, filed a complaint against his supervisor Renita Gray, Interim Director of Sponsored Programs. Jones alleged discrimination based on gender and race. His complaint alleged that the gender and race discrimination were based on behaviors by Ms. Gray, specifically as it related to these topics: bias in hiring, pay equity, remote work, and cameras being placed in his working space.

**Relevant University Policy:**

The University of Mississippi's Non-Discrimination and Sexual Harassment Policy states the following:

"The University of Mississippi does not unlawfully discriminate on the basis of race, color, gender, sex, pregnancy, sexual orientation, gender identity or expression, religion, national origin, citizenship, age, disability, veteran status, or genetic information. Employees, students, applicants for admission or employment, or other participants in University of Mississippi programs or activities who believe they have been discriminated against or harassed are entitled to seek relief through the University of Mississippi's Office of Equal Opportunity and Regulatory Compliance (hereinafter "EORC")."

"Anyone may make a report of harassment and discrimination at any time. Employees, students, applicants for admission or employment, or other participants in University of Mississippi programs or activities who believe they have been discriminated against or harassed are entitled to seek relief through EORC by making a formal complaint. However, unlike a report, formal complaints requesting investigation or other action by EORC should be submitted in writing within 180 days of the alleged discriminatory act. Formal complaints that allege a violation of federal non-discrimination laws will be resolved promptly and fairly. At the discretion of EORC, formal complaints that are not reduced to writing or that fall outside the specified 180-day time limit may be investigated. EORC may also conduct investigations as part of its regulatory compliance function that do not arise from formal complaints of discrimination or harassment."

**Background and Narrative Summary:**



120 LESTER HALL | P.O. BOX 1848 | UNIVERSITY, MS 38677-1848 | P: (662) 915-7735 | F: (662) 915-1229 | EORC.OLEMISS.EDU

It is important to note that Dr. Jones's allegations have taken multiple turns during the investigation. Dr. Jones has presented a vast amount of information throughout the investigative process. This revised his claim of discrimination from a complaint about his progressive discipline to an investigation of Renita Gray's possible actions of hiring practices and mistreatment violating the University's Non-Discrimination and Sexual Harassment Policy. Also, it should be noted that the investigation had several pauses due to the lack of follow-up or at the request of Dr. Jones, all of which are recorded in the file. EORC closed Dr. Jones's file due to the lack of follow-up on August 11, 2023, however, the investigation was reopened at Dr. Jones's request. Also, there has been hesitation from Dr. Jones before EORC contacted the respondent in the case, Renita Gray, for different reasons, e.g. waiting for travel to be approved, wanting to review witness statements in advance of the final report, and stating "there may not be a need to move forward" when things were going well in the ORSP office.

Dr. Ventez Jones's original complaint alleged that, at a meeting on January 5, 2023, he learned that Melissa Hodge-Penn, then the Vice Chancellor of the Office of Research & Sponsored Programs, would be leaving February 28, 2023. Dr. Jones stated that Lesha Agnew also announced that she would be leaving too. Dr. Jones stated that Lesha Agnew said her last day would be January 11th. Dr. Jones stated that he said in the meeting he said "Oh, yeah, me too one day, I plan to retire one day too." Dr. Jones said this was an "off-the-cuff remark;" however, he said he was joking.

Dr. Jones stated that days before Dr. Hodge-Penn left the University, she "hit me with an HR action" (progressive discipline). Dr. Jones stated that he has not been made aware of any policy violations. Dr. Jones stated that Dr. Hodge-Penn told him that she was being forced by HR to complete the progressive discipline by the 26th.

Dr. Jones stated that Renita Gray is now the performance manager of the progressive discipline. Ms. Gray became interim Director of ORSP after Dr. Hodge-Peen departed from the university. Dr. Jones questioned if Dr. Hodge-Penn could be contacted about the progressive discipline she created. Dr. Jones also asked if the progressive discipline could be removed since there was a change in management. These concerns were addressed with Dr. Jones by HR.

Twelve (12) witnesses, including Dr. Jones and Ms. Gray, were interviewed as part of this investigation. This investigation was the result of a formal complaint, however, some of the issues addressed by the complainants and witnesses fall outside of the 180-day time limit. Those issues are considered as background for assisting the office to determine the overall culture of the Office of Research and Sponsored Programs, as well as the length of any alleged problematic behavior in the department.

Dr. Jones, in an interview on April 18, 2024, was able to discuss specific allegations that he had that he believed were proof of discrimination based on race and gender. The topics were broken down into issues regarding searches and hiring, pay equity, ability to work remotely, and cameras in the building. Dr. Jones stated that the people recently hired were "middle-aged



120 LESTER HALL | P.O. BOX 1848 | UNIVERSITY, MS 38677-1848 | P: (662) 915-7735 | F: (662) 915-1229 | EORC.OLEMISS.EDU



CONFIDENTIAL

women" and a secretary, who had no experience, but had become a Research Administrator I. Two of the most recent hires, according to Dr. Jones, were hired at higher pay than he was making. He said he got a 3% increase in July of 2023. Dr. Jones believed the pay and hiring to be discrimination based on race and potentially gender.

As for Renita Gray, Dr. Jones said she had little pre-award experience when she was given her current job and there was no interview when she was placed in that position. Dr. Jones said that women were hired that had less experience than he had and were hired at higher pay.

This issue was addressed with Ms. Gray and another witness (Witness #7) familiar with the hiring processes. According to the witness, Dr. Jones's contention that the people hired in those roles having no experience was incorrect. He stated that though they may not have years of experience in pre-award, but they have sufficient experience in accounting or administration with knowledge of the job and duties. The witness stated that it is very difficult to find any RAs with 10 years of experience, noting that they're too in demand, particularly in the private sector, so the witness said their solution has been to hire those with accounting experience and to train them in the processes. The witness said that they did give all pre-award RAs the same salary, but did not work on adjusting salaries for post-award RAs, but they are reviewing that now with the View 2022 guidelines.

Ms. Gray explained the reasoning for the cohort being hired in similarly and said that she was not on the search committee for the cohorts' hires because she did know one of the applicants well. When they were hired, one was paid more than the others so the Office of Research and Sponsored Programs agreed to pay them all similarly. Ms. Gray admitted that did cause a problem with Dr. Jones's salary, but she said she did not feel as though he should get a raise based on his behavior. She said that he had been on an improvement plan prior (which was later clarified as a Progressive Discipline Plan by Witness #10) and he would follow up everything she asked him to do with the question of whether or not she was making everyone do what she was asking or if it was just him.

An example brought up by both parties was a discussion about conferences. Dr. Jones said that two of the White female employees were allowed to go to Hawaii for a conference. Dr. Jones said he asked to go to Auburn, which was much less expensive, but was not allowed to go. Ms. Gray explained that she let everyone know that they could attend only one conference per calendar year. The two that went to Hawaii had another academic unit on campus to pay for their flights, so she agreed to let them go to that one as the cost of the conference was about the same cost as others. Ms. Gray said that when Dr. Jones questioned her about it, she did not feel as though she had to justify the reasoning. Ms. Gray said the reason she declined Dr. Jones's request to go to Auburn was because that would have been his second in a calendar year (he requested to attend one in Kentucky as well). Ms. Gray said this year Dr. Jones will be going to Hilton Head.

Ms. Gray said that Dr. Jones refuses to communicate with her about when he will be out. Dr. Jones also stated that Ms. Gray does not speak to him, which is why he copies her supervisor on









CONFIDENTIAL

his emails. She said that he just puts on the calendar when he is out and never contacts her. According to Ms. Gray, she has to contact him to find out if he is coming to work. She said that he let her know that he would not be coming to the Christmas party and said he would be back on January 2nd. He did not come in, so she texted him. Ms. Gray said he responded later in the day and said he would not be coming back to the office "in the near future," but would instead be working remotely. Ms. Gray said that Dr. Jones said he had car issues but would not send updates about these car issues.

Another employee, according to Ms. Gray, would often check in with her about car issues that employee was having, but Dr. Jones would not. Ms. Gray said that Dr. Jones did not come back to work until March 18. Dr. Jones said he returned February 18. The other employee, according to both Ms. Gray and her supervisor, has completely different work and job requirements than Dr. Jones. Additionally, that employee took leave for a month in order to get her car in working order. Ms. Gray's supervisor said that the employee that Dr. Jones referenced's job consists mostly of data entry, whereas Dr. Jones needs to be available to faculty at the office. Ms. Gray's supervisor said that he stated that everyone needed to be in the office except on their remote day.

Another issue raised by Dr. Jones was cameras that have been placed in Barr Hall. Dr. Jones said he was told that there had been a break-in of someone's office and that information at ORSP. Dr. Jones said that everything in their files is public information, but there is a locked door inside the building and only two people have a key. He said no police report was filed. He was told that one of the scenarios was that a Black female temporary employee was coming in. Dr. Jones said he also heard at one point that he was the one that had supposedly broken in. Dr. Jones said cameras were then installed: one facing the door from the south and one from the north. He said they could probably read texts on your phone or see if you are at Rebel Market. Dr. Jones said files are on all floors, but they only have cameras on the first floor. Dr. Jones said that Awards are on the third floor, but he and Witness #9, a Black female employee are on the first floor.

It was confirmed by Ms. Gray and the witnesses that there were cameras installed in Barr Hall on the first floor. There are also cameras on the third floor outside of the accountant's office. Ms. Gray said they have Controlled Unclassified Information (CUI) and have to keep them in a controlled environment. Ms. Gray said only about three files are under the CUI. She said the cameras were in an open area and outside the accountant's office because there were personnel files. When asked about Dr. Jones understanding that the cameras were installed due to a break-in, Ms. Gray stated that she did feel as though Dr. Jones had been in her and the accountant's offices. She said she had even gone as far as going into his office to see if items missing from those areas were in his office or desk drawer. Her supervisor acknowledged that he had cameras installed after being told by Ms. Gray that she believed there had been a break-in but he believed that it was needed based on Ms. Gray and another employee's belief there had been a breach. The witness said that he thought there had been three offices that were compromised but could not recall a third (he did remember Ms. Gray saying it was her office and the accountant's office).

**Analysis:**



120 LESTER HALL | P.O. BOX 1848 | UNIVERSITY, MS 38677-1848 | P: (662) 915-7735 | F: (662) 915-1229 | EORC.OLEMISS.EDU



CONFIDENTIAL

Dr. Jones made allegations that job searches within ORSP resulted in the hiring of all white women. However, Witness #7 explained that this was not the case, but hiring committees followed the recommendations of that committee. Although Dr. Jones may not believe their qualifications were enough, the search committee, as well as upper administration believed their comparable experience did qualify each new hire for the positions in question.

Although Ms. Gray did make a comment about concern in putting a Black female in that role after one had been mistreated in the Research Administrator role prior and although that statement is concerning given the allegations, a review of the search information did not reveal any discrimination in the searches or hiring processes. Therefore, the allegation that there was discrimination in the search and hiring process could not be substantiated.

The pay equity issue was addressed and acknowledged by Witness #7 and Ms. Gray. Witness #7 confirmed that they had approved the increase in pay for the new hires. That issue may be resolved in the View 2022 review. Ms. Gray and other witnesses raised valid concerns about Dr. Jones's communication skills with others, particularly those in authority. Dr. Jones was out of the office from November 2023 until February 2024, has arrived late, does not let his supervisor know where he will be, nor does he communicate well to let them know if he is not coming in to work. Additionally, his responses have been problematic, and one witness gave an example of Dr. Jones's hostility to Ms. Gray. The witness said in a group text in which Dr. Jones stated that he would be out because he was sick, Ms. Gray had responded and said, "feel better." Dr. Jones then seemed to be upset in his response that she had discussed his health. The witness said they have never had issues with either party but did think the communication was strange. These actions were referred to Human Resources when they started, particularly as there is documentation of these issues. Ms. Gray referenced the previous Progressive Discipline Plan as one reason she did not think Dr. Jones deserved a raise. As that plan has been discharged, it should not be considered in the future for Dr. Jones and his pay. His performance and other issues with the department may be considered, and these concerns should be referred to Human Resources in the future, if they occur.

As for the ability to work remotely, it was explained by Witness #7 that Dr. Jones's position needs to be on campus to interact with faculty. Dr. Jones pointed to another employee that has worked more remotely; however, that employee's role is much different than Dr. Jones's role. Dr. Jones and all the other Research Administrators have been given one remote day a week as a compromise. Dr. Jones, according to administrators, still does not come into work all the days that he should and says that he is working from home, which has not been approved with the exception of one day a week, which again is an issue the department should bring up with Human Resources if it continues.

The cameras being placed in the building are the most problematic. Although the building does have classified documents and, on its face, this seems to be a race neutral reason, the cameras were not installed until Ms. Gray believed there had been a break-in based on a paper clip and missing batteries from an area. With no additional proof, Ms. Gray assumed it was one of two people, either Dr. Jones or another former Black employee. Ms. Gray admitted that she believed it was Dr.





CONFIDENTIAL

Jones, although it does not appear as though Ms. Gray had a conversation with Dr. Jones about these suspicions. The first that Dr. Jones heard about the cameras was from a mass email sent out by Ms. Gray's supervisor.

Ms. Gray further admitted when asked if she was comfortable around Black and non-White people that she was "very uncomfortable" and had sought help with it from the University's Division of Diversity of Community Engagement. Further, and unrelated to Dr. Jones, Ms. Gray had taken at least two Black employees to speak with that office. In one instance, Ms. Gray said it was to help her better understand her own discomfort.

The Equal Employment Opportunity Commission (EEOC) describes intentional discrimination as when an employment decision is affected by the person's race. It includes not only racial animosity, but also conscious or unconscious stereotypes about the abilities, traits, or performance of individuals of certain racial groups. Although Ms. Gray may have race neutral reasons for the pay equity issues and valid concerns with Dr. Jones's work habits and communication, they have not been articulated well. Further, Ms. Gray's comments are also concerning as to whether she can manage these issues without considering race. The cameras in the building, while perhaps necessary, were only placed after she suspected two Black employees of a break-in, which, as Dr. Jones pointed out, was not reported to the police, and would seem necessary if the files and information are valued. The relationship between Dr. Jones and Ms. Gray now hinders the ability for either of them to feel comfortable communicating without a third party. Ms. Gray has treated Dr. Jones differently, and one witness stated that she "has her favorites" and takes a harsher tone when communicating with Dr. Jones than with other employees. Ms. Gray's relationship and comments around other Black employees has made them also feel uncomfortable and that is problematic. Therefore, the actions taken by Ms. Gray can be viewed as disparate treatment of Dr. Jones based on race.

<u>**Findings:**</u>

There is sufficient evidence to find Ms. Gray engaged in racial discrimination in violation of the University's Non-Discrimination and Sexual Harassment Policy.

There is insufficient evidence to find that Ms. Gray engaged in gender discrimination in violation University's Non-Discrimination and Sexual Harassment Policy.

<u>**Recommendations:**</u>

It is recommended that Ms. Gray be removed from all supervisory roles within ORSP. Dr. Jones should have an alternative reporting structure if Ms. Gray cannot be removed from these duties. Additionally, it is recommended that Ms. Gray seek non-bias, sensitivity training to gain assistance on how to work better with people of different ethnicities and backgrounds. This can be achieved by working with the University's Division of Diversity and Community Engagement (DCE) or other organizations deemed appropriate by DCE. If Ms. Gray decides to complete training with an outside organization, DCE should be provided with proof of completion of training.

CONFIDENTIAL

**RETALIATION PROHIBITED:**

Memos will be disseminated to the parties regarding this decision. EORC reminds the parties to this complaint that the University of Mississippi does not tolerate unlawful discrimination based on race, color, gender, sex, sexual orientation, gender identity or expression, religion, national origin, citizenship, age, disability, veteran status, or genetic information. The parties are further advised that the investigation is confidential and that retaliation against anyone who reports a claim of discrimination, witnesses the alleged discrimination, or participates in the investigation of a claim will not be tolerated.

**APPEAL RIGHTS:**

This decision may be appealed through the Office of Provost in writing within five (5) days of your receipt of this decision.

If you have any questions regarding my findings, contact me at 662-915-7735.

Respectfully,

EORC

CONFIDENTIAL