IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RENITA GRAY PLAINTIFF

VS. CAUSE NO. 1:24-CV-191-SA-DAS

BOARD OF TRUSTEES OF THE STATE INSTITUTIONS OF HIGHER LEARNING FOR THE STATE OF MISSISSIPPI D/B/A THE UNIVERSITY OF MISSISSIPPI DEFENDANT

*****************************************************

ZOOM VIDEOCONFERENCE DEPOSITION OF HONEY USSERY

*****************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFF
IN THE LAW OFFICES OF WAIDE & ASSOCIATES, P.A.
332 SPRING STREET, TUPELO, MS
ON APRIL 2, 2026, BEGINNING AT 10:46 A.M.

(APPEARANCES NOTED HEREIN)

Reported by: LUANNE FUNDERBURK, CCR 1046

---

LF REPORTING
P.O. BOX 2996
TUPELO, MS 38803
(662) 871-5419



APPEARANCES:

For the Plaintiff:

JIM WAIDE, ESQ.
Waide & Associates, P.A.
P. O. Box 1357
Tupelo, MS 38802
(662) 842-7324
waide@waidelaw.com

For the Defendant:

PAUL BOWIE WATKINS, JR., ESQ.
Mayo Mallette, PLLC
5 University Office Park
2094 Old Taylor Road, Suite 200
Oxford, MS 38655
(662) 236-0055
pwatkins@mayomallette.com

Also Present: Renita Gray, Plaintiff



TABLE OF CONTENTS


| WITNESS | PAGE |
|---|---|
| HONEY USSERY | |
| Examination by Mr. Waide................. | 4 |
| Examination by Mr. Watkins............... | 60 |
| EXHIBITS | |
| 1 Handwritten Notes UM40-46............... | 63 |




HONEY USSERY, after being duly sworn, testified as follows:

EXAMINATION

BY MR. WAIDE:

Q. Would you state your name, please?
**A. Honey Ussery.**
Q. Ms. Ussery, would you give me your employment history beginning after you graduated from law school, what all you've done since you left law school? When did you graduate from law school?
**A. I graduated from law school -- well, I finished in December of 2007, but I walked in May of 2008. I went to work for Tannehill Carmean for a short period of time after graduation. And then in July of 2008 I started at the Third Circuit District Attorney's Office as an assistant D.A., and then I worked there until August of 2014.**
**And let's see, I had my own practice from August 2014 until October of 2015. And in October 2015, I started at the University of Mississippi as a Title IX coordinator. And then I stayed there until November of 2024. I was promoted from Title IX coordinator to, I think it was Assistant Director of Equal Opportunity and Regulatory Compliance. And then in late August of 2024 right**

EXHIBIT "14"

**before I left I was promoted to Director of Regulatory Compliance. And then in December, right after I left the university, I went back to the Third Circuit District Attorney's Office, and that's where I'm employed now.**
Q. You're an assistant D.A.?
**A. Yes, sir.**
Q. Who's the D.A.?
**A. Ben Creekmore.**
Q. I'm sorry. Surely I've seen you, but I didn't --
**A. Yes. I think we met when I came -- I was in law school. Mike Lewis is --**
Q. Oh, I know. I was fixing to bring it up at the end, but I didn't want to ruin the deposition by doing it now.
**A. That's fine. That's right.**
**(Off record discussion).**
Q. (Mr. Waide) First of all, I'm not asking you this to embarrass you. In fact, I hate to be -- because of my relationship with Mike, frankly, I hate to even be asking you this. I don't know what your relationship with Mike is, but Mike is my personal good friend, really good friend, so I --
**A. I know.**



Q. -- hate to be on the other side of you frankly for that reason, though I don't know what your relationship is with Mike. But anyway, I'm going to have to ask you some questions that may be embarrassing to you.
**A. Oh, that's fine.**
Q. At one point you were considered to work at the University of Oklahoma or some college in Oklahoma, weren't you?
**A. Yes. Yes, sir.**
Q. As it turned out, you did not become employed there, correct?
**A. I did not.**
Q. And what year was that? When was that?
**A. That was in 2024. Right before I went I was -- right before I was promoted, and then subsequently left to go back to the district attorney's office.**
Q. All right. Did the university of -- is it University of Oklahoma?
**A. University of Oklahoma.**
Q. Did they make you an employment offer?
**A. They did.**
Q. Did they subsequently withdraw it?
**A. No.**



Q. They did not?
**A. They did not withdraw the offer, no, sir. So what happened was I -- at the time, the university, we had a lawsuit and I was supposed to be a witness. And, of course, there was some publicity about the lawsuit. They were concerned, obviously, and they even told me they would have to send somebody to sit through that trial. The board of trustees out there, because of the publicity of the lawsuit, they said that once I got out there they could just take it through the board of trustees. But my concern was -- I mean, in Norman, Oklahoma -- I've lived in Mississippi my whole life -- is that we've moved all the way out there and then the board of trustees had some issue and didn't approve it, there I was going to be stuck in Oklahoma without a job and having quit my job.**
**So I sent them a letter and actually had a conversation with an attorney myself on how to phrase the letter. And basically just declined, withdrew my acceptance. That's -- because I had concerns in some of the conversations I had with their general counsel and their HR about how supportive they would be with me in that role. And the University of Mississippi had been extremely supportive like -- because this job**



**is -- obviously we're sitting here and we've been sued in Title IX cases, so I was concerned about the support from the university moving forward, so I decided not to move out there.**
Q. Well, let me ask you, all I've seen is the news report and I just saw that recently. I've never looked up a case, but I saw a news report on a ruling by Judge Jordan under the Southern District of Mississippi. And his ruling, I think it was on a motion to dismiss, and his ruling said there were allegations that you had not provided exculpatory evidence in a case or had not disposed exculpatory evidence resulting in a finding of rape against a student. And Judge Jordan wrote an opinion about that, that -- the news article said he denied the motion to dismiss based on those allegations. Is that true?
MR. WATKINS: Object to the form.
If you can answer that question, you can.
**A. I don't believe that was -- I don't think that was the basis of the dismissal. I mean, you would have to bear with me. I'm sure Paul could help more on this, but I believe -- I tried not to get too involved in the legal part of all this, but I think that the reason for the dismissal was that the young**

**woman had not shown up to the hearing, so there was concerns that they didn't have a right to confront the accused in that case. Our office was operating off of the Dear Colleague Letter from the Obama regulations, which a lot of universities were, so he had concerns about the due process with our office.**

**And again, that was how everybody was, I guess -- that was the normal process at that time, so I believe that was the basis of the dismissal.**

Q. We -- we can both get the opinion and see it, but I -- the news article may have --

**A. Sure.**

Q. -- misquoted it, but it said that he also found that you had exculpatory evidence indicating that this guy was innocent, and it was not included in your report. That's not in your --

MR. WATKINS: Object to the form. Jim, I'm going to say what I said in the last deposition. That didn't happen. You don't have the document in front of you. I'm glad to have a conversation with you and share everything that happened in that case, including the defense verdict that happened after a full trial on the merits of Title IX.

MR. WAIDE: Oh, I'm sorry.

Q. (Mr. Waide) Let me get back to this next



question. Like he says, I don't have the opinion by Judge Jordan so there's no point in me --

**A. Sure.**

Q. We can both read it. But he just made a statement I was not aware of. Was there a trial in which the defendant won and the plaintiff lost the case? Is that what I understand?

**A. Yes. There was a trial.**

Q. And the plaintiff lost the -- the verdict was for the defendant?

**A. Correct.**

Q. Was for the University of Mississippi or whoever was being sued on the merits?

**A. It was the University of Mississippi, yes, sir. That was the case that the University of Oklahoma had been concerned about because I had to come testify, I believe it was in August of that -- was it August? August of that same year? August of that same year. The trial had been set, so it kind of interfered -- it all landed at the same time.**

**So it was August of that year. There was a trial, and I was a witness obviously because it was a Title IX case, and the verdict was for the defendant, which was the University of Mississippi.**

Q. And who was the -- I assume must have been



Mayo Mallette was the attorneys for the defendant?

**A. Yes, sir.**

Q. And who was the plaintiff's attorney? Do you remember?

**A. What's his name? Lawson Hester.**

Q. Lawson Hester was the plaintiffs attorney?

**A. Yes, sir. Out of Jackson.**

Q. Yeah, I know him. I'm just surprised he was a plaintiff's attorney.

**A. I don't know what to tell you. I remember him. He was there.**

Q. At the time I'm sure they had -- they were minors at the time, so their names aren't in the court record, but these people -- they would be over 21 now, wouldn't they, the boy and the girl both?

**A. Yes, sir.**

Q. What are their names?

**A. The --**

MR. WATKINS: Jim, you and I can have a conversation about that. There were orders in that case that I don't have in front of me that Judge Ball ordered about their identities. I know the case is over, but I'm a little reluctant to have Honey, who was a witness, in that case tell you that right now. But I -- there are places that you can get that



information, and I'm glad to share that.

MR. WAIDE: Do you mind just sharing it? Send me a letter or something afterwards? Do you mind just telling me who they were?

MR. WATKINS: We can get you that information.

MR. WAIDE: Okay.

Q. (Mr. Waide) Let me -- we've already been through in detail with the previous witness this report, which counsel has on his computer, your final report. He might want to show it to you, but I'm not going to go through the same questions, but I just want you to be familiar with what we're talking about. It's got a title of it, Complaint. It's Bates 55.

MR. WAIDE: Can you show her that, Paul? Have you got it there?

MR. WATKINS: Yes. She's looking at the first page.

**A. I see it.**

Q. (Mr. Waide) Had you reviewed this before your deposition today? Had you looked at this?

**A. I have not.**

Q. Oh, you haven't?

**A. No.**

Q. Have you done anything to prepare for the

deposition, then, if you didn't review this report?
**A. No.**
Q. All right. Here's something that I'm trying to figure out here. Look at the very first -- did you write this report?
**A. I think that -- I think I did. I don't remember. I feel like we all contributed, but I think I wrote portions of it, if not all of it. I'll be honest with you, I don't remember. It's been awhile.**
Q. Look at Bates Page 55, the very first page.
**A. Uh-huh (yes).**
Q. And it says, Jones, ..., filed a complaint against his supervisor, Gray. Do you see that?
**A. I do. Uh-huh (yes).**
Q. Here's my question: Do you have any idea when that complaint was filed?
**A. I do not.**
Q. Do you have any idea where that complaint is? Has it disappeared? It's not attached to any of the documents we've seen in discovery. Where is that -- where would it be?
**A. I don't know.**
Q. Would y'all keep that complaint on file somewhere with the university?
**A. I'm assuming that someone would have notes**



**about conversations that they had with Mr. Jones about a complaint, yes.**
Q. Well, there's no indication -- at the time you worked at the university, you would not have served a copy of the complaint on the person that's being accused of discrimination? They wouldn't get a copy of the complaint?
**A. Well, now, you'll have to -- that would be a question for Kimberly and/or Billy Benson. I worked on the Title IX's side. So Title IX works much differently than employment. On Title IX, absolutely, we are required to give a complaint -- it's a very -- it's a regulated process. I obviously can't speak to what all they gave Ms. Gray in this case.**
Q. So you don't -- why would you not give a copy of the complaint to the person being accused in a race discrimination case?
**A. Well, I'm saying that they obviously would have a conversation with her about what the allegations were. I believe the practice at the time was to send her an email saying what the allegations were, or at least saying there's been a complaint filed against you. Again, that's a question for Kimberly. I can't remember what their process was. I came in on this case because Billy Benson was out on**



**maternity leave, so I was much later in this process. I don't know what was done here.**
Q. It says that he has -- it says, Jones alleges discrimination based on gender and race. Do you see that?
**A. That's what it says.**
Q. And Title IX relates to gender discrimination, right?
**A. It is -- so it would be sexual harassment. Yes, it could be gender based, but not this -- this didn't fall under Title IX.**
Q. Do you remember Mr. Jones?
**A. I do.**
Q. Over what period of time would you say -- this report is dated June 6th of '24. Over what --
**A. It would have been around that time. I didn't have the initial conversations with Mr. Jones. I believe Billy Benson was having conversations with him. I only had one brief conversation with him to kind of try to figure out questions that I needed to ask witnesses because Billy had been out -- was out on leave.**
**(Off record discussion).**
Q. (Mr. Waide) Look on Page 56, the second page of this report. I tell you what, let me make it clear



about this. I guess this is self-evident. The complaint that y'all were investigating concerning Ms. Gray was the complaint by Mr. Ventez Jones, correct?
**A. Yes, that's correct.**
Q. And do you remember -- I know there's things here in the report, but do you remember -- and you haven't read the report lately. Do you remember what, in the course of your investigation, just in general you found out about Mr. Jones? What do you remember the kind of things you found out about Mr. Jones in your complaint -- in his complaint?
**A. Okay. So I'm looking at reading just this, it is important to know, all of that. I did not write that. So like I said, I think everybody in the office contributed to the report. I found out that he had come to talk to -- I'm going to read through this if you don't mind real quick.**
Q. What I'm going to be asking you about is the underlined portion on the second page. That's my writing. Those underlinings are my writing.
**A. Right. So it looks like -- I do remember that he had come in several times, and it was unclear whether or not he was filing a complaint or not. I think that Billy, again, would be a better person to ask these conversations (sic) because he had a**

**majority of those conversations with him. It looks like they closed the file because he didn't follow up. But then, I don't know how he asked or requested that it be reopened. Waiting for travel -- okay. So that really, like you said, speaks for itself. I think Billy Benson had these conversations with Mr. Jones.**
Q. The file -- what the file says, there were several pauses due to follow-up. Was that Mr. Jones' failure to follow up?
**A. That would be my guess, yes. That there was probably -- so if somebody indicates that they may want to file a complaint, typically our office would follow up and just say, hey, we -- so that we can close the case if they don't -- aren't filing a complaint, or we can proceed. And it looks like there was no follow-up, so the office closed the file.**
Q. All right. I'm looking at the top three lines. Do you remember -- in the top three lines, do you remember that his initial complaint was about a previous supervisor who was black? Do you remember that? This doesn't say black on the report, now. I'm just telling you --
**A. Oh, okay.**
Q. It starts out, this revised his claim of discrimination from a complaint about his progressive



discipline.
**A. Oh, yes. Okay.**
Q. Do you remember that he was complaining about a previous black supervisor that he had?
**A. No. Again, I didn't have those conversations so, no. I believe Billy is the one who wrote -- he had to have been the one who wrote this, because I didn't know anything about this.**
Q. You didn't know anything about his complaining about his previous supervisor, Ms. Penn?
**A. No, no, no. I'm saying that Billy would know complaining about progressive discipline. Oh, here's the thing, and I'll go ahead and note this. We knew that there were issues with some work performance with Ven Jones. I think that was established, yeah.**
Q. So it was established that he -- it was established that he had work performance problems?
**A. Uh-huh (yes). Yes.**
Q. Okay. And I know you didn't write this. Who did you say wrote it? Billy Benson?
**A. I believe, yeah, Billy Benson, because he would have been the one who had this information. Like I said, we all contributed because -- it was supposed to be his report, but then he had to go on leave so I had to finish it.**



Q. I see. Is Billy Benson black or white?
**A. Black.**
Q. Black?
**A. Yes.**
Q. And how long had he -- how long had you served on this committee with him?
**A. On the committee -- how long did he -- oh, no. This was -- this was his case, so I -- let me -- he was -- so Billy, for example, he wasn't there for some of the subsequent interviews and he was not there when we interviewed Renita. So this was his case. Everybody is assigned a case. I usually didn't come in on these because I had my hands full with Title IX cases, but because he had to go out on leave I came in on this.**
Q. So he was not present at her interview?
**A. No.**
Q. But you wrote -- you say --
**A. I wrote that part.**
Q. You wrote what part?
**A. The part whenever Renita's interview was. I wrote that because I was present for that interview. Billy was not.**
Q. I see. Okay. This stuff we're talking about now, this is stuff that Billy -- the top of this



second page, is this stuff that Billy wrote or you wrote?
**A. Billy. Billy would have had to been the one who either -- yeah, he would have had to have written that.**
Q. All right. So according to Billy, at least, Jones had started an investigation and then quit. And according to Jones, it was a progressive discipline program. Do you remember that this first person that had given him progressive discipline was Dr. Melissa Hodge-Penn? Do you remember that?
**A. Oh, yes. I knew Dr. Hodge-Penn, so yes. And she had had issues with him in the past. I did know that.**
Q. Is she black or white?
**A. Black.**
Q. So he was claiming she was discriminating against him, also?
**A. No.**
Q. But it says --
**A. It says discrimination. I think his was based on gender. I don't remember.**
Q. You don't remember. But he was making some complaint about Penn?
**A. Right. Right. Which --**

21

Q. Do you remember --
**A. I -- she was no longer at the university. By the time he started complaining about her, she left.**
Q. So she's a black female?
**A. Yes. She's a black female.**
Q. And he made complaints about this black female. Did he say she was -- did he claim she was discriminating against him or he just didn't like her or what was wrong?
**A. Again, it's his claim of discrimination. I don't know the specifics on that. I do know that he had issues with her. That bore itself out during the investigation that he had had issues with her.**
Q. Okay. Now, what kind of employee was she? Did y'all find anything to indicate she was a bad employee or that she was discriminating against him?
**A. She already left by the time he came to our office. She went to work at a different university. I don't think -- I don't think anything came of that because she was already gone.**
Q. So you didn't make any determination about whether he was telling the truth when he claimed Ms. Penn was discriminating against him?
**A. I do not believe so. You will have to ask Billy, but I don't think they ever opened it because,**

22

**again, she's no longer employed with the university.**
Q. Did you learn anything about her whether she was considered a good employee?
**A. Melissa Hodge-Penn?**
Q. Yes.
**A. I believe that -- no. I don't -- again, I didn't do any investigating into Dr. Hodge-Penn. I was only asked to look at this.**
Q. I'm looking down in the second paragraph where it says that in February of '23. In substance it says that Penn was leaving the university February 28, 2023. Do you see that down in the third line?
**A. Yes.**
Q. This would have been before Ms. Gray was his supervisor, right?
**A. February of -- I'm assuming so, yes, if Dr. Hodge-Penn was his supervisor.**
Q. And then he goes on to say he -- he said he himself -- no, I'm sorry. He said that Lesha Agnew would be leaving. And then he said --
**A. Yes.**
Q. Okay.
**A. I see that. Uh-huh (yes). She would be leaving too.**

23

Q. And then down in the third paragraph Penn -- he says they hit him with an HR action.
**A. Right. I do not believe those two things were connected. But again, you'll have to ask Billy about that.**
Q. Did y'all ever -- I think -- I don't know whether you remember the statements back, but y'all interviewed a supervisor, Dr. Easson, who was Dr. Gray's supervisor. Do you remember that?
**A. I do.**
Q. And do you remember what Easson's opinion about Jones was?
**A. I don't believe he had very a positive opinion of Ven Jones, no.**
Q. Do you remember --
**A. Ven Jones, by everyone -- well, I say everyone -- by his supervisors' accounts was a very difficult employee.**
Q. Okay. And what about Ms. Gray? What type of employee was she?
**A. I don't know. I think Dr. Easson said that she -- it depended on who you asked. Now --**
Q. I'm talking about supervisors, the people that supervised her.
**A. Oh, okay. Her immediate supervisor -- I**

24

**guess that would have been Greg. Would it be Dr. Easson then?**
Q. In my opinion --
**A. Okay. I can't remember who her exact supervisor was. There was a lot of movement in that area at that time. I don't know if you knew this, but they were bringing in an entirely new staff interviewing for people at that time. I think Greg was actually interim, so he hadn't worked in that position the whole time. Again, you would have to ask Greg.**
Q. Yeah.
**A. But I do remember he said she did her job, you know. I don't remember hearing anything negative about her as far as her work performance, you know, from Dr. Easson.**
Q. All right.
**A. And apparently -- and I think Ven did his job. He was just very difficult to work with. Some of the emails that I saw that he was sending them were inflammatory. Let's just say that. He was not -- he was not a -- he didn't know how to express himself in a professional manner sometimes. I had no issue with the progressive discipline issue.**
Q. Were the allegations he was an insubordinate

employees.
**A. Yes.**
Q. Were you aware -- by the way, were you subpoenaed or were you just asked to come here for your deposition today?
**A. I was just asked.**
Q. Of course, you're not a university employee so you could have declined and insisted on a subpoena being issued, correct?
**A. I absolutely could have.**
Q. But as an employee, if he were directed by the university or somebody representing the university to be here, in your opinion should he have followed that direction?
**A. Yes.**
Q. Would you consider it --
**A. I would have.**
Q. Would you consider it insubordinate not to if somebody in authority at the university asked you to come to a deposition and you refused?
**A. I believe so.**
Q. I want to ask you a thing that's kind of become the heart of the complaint that Ms. Gray has, and it's a statement in the -- I'm going to try to find this in the report --



**A. Okay.**
Q. -- concerning not being comfortable around black people. Let me see if I can find this.
**A. I see it.**
Q. I don't see it. What page are you on?
MR. WATKINS: I think it's on Page 6, Jim.
Q. (Mr. Waide) Yeah, here it is. I want you to think hard about this question because it's kind of become the heart -- or I guess everybody has their own opinion about what the heart of the case is. But in my opinion, it's become at least a big part of this case. Ms. Gray -- says, Ms. Gray further admitted when asked if she was comfortable around black and white people that she was very uncomfortable and sought help from the university's -- etcetera, and sought help from the university's division of Community Engagement. Do you see that?
**A. Yes. I see that.**
Q. Here's my question: Do you recall her saying that she was very uncomfortable around black people?
**A. Yes.**
Q. Well, you took contemporaneous notes, did you not?
**A. Yes.**
Q. Have you looked at those notes?



**A. No.**
Q. I'm going to ask you --
MR. WAIDE: Counsel, do you have them to make them available to her?
Q. (Mr. Waide) Are you aware that your contemporaneous notes do not contain any such statement as that?
MR. WATKINS: Object to the form.
Q. (Mr. Waide) You don't know whether they do or not?
**A. I do not. I haven't looked at them.**
MR. WAIDE: Counsel, they're actually --
Q. (Mr. Waide) I got these on the day before we started the depositions so I haven't -- to me, they're kind of hard to read. All three of you took notes, so I need to make sure I got the right ones. But I think the ones that are yours are Bates --
**A. They may be hard to read.**
Q. -- 218. They're hard to read.
**A. I'm sure. I'm sure.**
MR. WATKINS: I can help for Honey's handwriting. They're hard to read.
Q. (Mr. Waide) Bates Page 218. Are those yours on Bates Page 218?
**A. I don't know whose those are.**



Q. Those are not yours? All right. Well, let's go to Bates Page 247. There's another set of notes.
**A. There you go. Those are mine.**
MR. WATKINS: She's looking at 240 when I scrolled past that.
Q. (Mr. Waide) I've got a Bates page of notes beginning on Page 247. Is that yours there?
MR. WATKINS: Let me look at 247.
**A. That looks like Greg's.**
MR. WATKINS: She says 247 is not hers, but the notes that start on 240 do look like hers. Is that right, Honey?
THE WITNESS: Right, yeah. I'd be shocked if I didn't put a note in here.
Q. (Mr. Waide) Those look more legible than anybody's, then. I know this may be a little bit tedious, but go to --
**A. No. I need to look through. I'm trying to read through this.**
Q. I'll try to find where --
MR. WATKINS: Jim, we're sitting here scrolling at this point. Do you want her to try to identify something?
MR. WAIDE: I'm trying to find it myself. I thought there was some reference to --

**A. Uncomfortable. Yeah, very uncomfortable with black and white -- or nonwhite people.**
Q. (Mr. Waide) What page are you on?
MR. WATKINS: 242 is what she's pointing at.
**A. Yeah. I did put it in there.**
Q. (Mr. Waide) All right. Let me find that. About what line are you on?
MR. WATKINS: It's close to the bottom. The word uncomfortable is underlined.
**A. It says why she went to see Jazmine.**
Q. (Mr. Waide) No, it says -- if I'm reading this right now, maybe I'm misreading your notes. Frankly, I didn't see this in the report before. It's a ways up there. It's a very uncomfortable with black or white people.
**A. Nonwhite people.**
Q. Oh, black or nonwhite?
**A. Yeah.**
Q. Then you've got Page 6. What is that?
**A. This is people. That's my -- that's people. P-P-L was what I put for people.**
Q. And then it says why she went to see J-U-Z-U-N-E.
**A. I'm going to say that's -- I don't know if**



**Jazmine. Why she went to see -- was it Jazmine. I think she was talking about that's why she went to see the people at Diversity Equity and Inclusion.**
Q. Let me ask you this: Is it not true that what she told you was that a person of Middle Eastern dissent, a professor, had mistreated a black employee and that she had gone with this black employee to, I think it's a different committee, not your committee, but some diversity committee at the university to support her and try to find out how to handle a situation when a black person is being mistreated?
**A. She mentioned that. It wasn't in this context. Like, this was -- we were specifically -- again, you'll have to excuse me here. I'm trying to rely on my recollection, but I do remember this was almost -- she had taken some -- one of her staff members, and I cannot remember what staff member it was, to see Diversity Equity and Inclusion to try to figure out how to better talk to black or nonwhite people, and that person was very uncomfortable. I cannot remember what staff member that was.**
**And then -- and I don't know that I interviewed. Anyway, so then this was almost a throwaway question that I ask in multiple interviews, like, if we're doing something based on race. Usually**



**I say, what's your comfortability with black or nonwhite people? This was not in that context. She wasn't talking about this. I literally asked this pointed question. It wasn't about -- those two things were not related. I think she mentioned something about that, but that was on down. She began talking at this point about how she was raised in the Midwest, I think Kansas or something, on a farm. Hadn't been around many nonwhite people. I mean, this -- this sticks out in my mind because I had never heard this when I asked that question in the past. So, yes, she did talk about that, but that was very -- that was unrelated to this, if that makes sense. You know what I'm saying?**
Q. Are these two sentences -- one comes right after the other -- or two phrases. One is right after the other. Are you saying those two -- one says very uncomfortable and the other says why -- begins why, and it's one line after --
**A. Yeah. I think she was saying why she went to see that person was because she was uncomfortable. I think -- she was trying to figure out with Diversity Equity and Inclusion how better to speak to black and nonwhite people.**
Q. Okay.



**A. How better to, like, relate to those employees.**
Q. And your impression is that she was saying she was uncomfortable with black people?
**A. That's what she said.**
Q. Oh, she went to -- so according to what you recall, that's why she went to the diversity committee, right?
**A. Yes. Well, I don't know if that -- I don't know if that was -- I don't know what name that's supposed to be there. I'd have to look back.**
Q. Well, I'm asking for your recollection. Your recollection is she was saying --
**A. Yes.**
Q. -- she was uncomfortable with black people. Therefore, she went to see the diversity committee, correct?
**A. Right. Yes.**
Q. And from what you remember, what did she say her purpose was in seeing the diversity committee?
**A. She was -- I mean, I guess she was trying to figure out how better to relate to black and nonwhite employees or black and nonwhite people.**
Q. Okay. So your interpretation of what she said was that she went to see a diversity committee

because she was uncomfortable with black people?
**A. Not -- it's not a committee. It would be to go to that office just to talk to somebody. There was nothing about a committee.**
Q. It's a diversity office of some kind?
**A. It was at the time. I don't think it exists anymore.**
Q. So we're saying that at some previous point in time -- what you remember her saying was at some previous point in time she had been to a diversity office and her purpose -- and if I'm telling this wrong, you tell me. And her purpose was because she wanted to learn how to relate better to black people?
**A. And nonwhite.**
Q. I'm sorry. And nonwhite.
**A. And nonwhite. So people of color, yeah.**
Q. And this had come several months before? This wasn't at the time that she was -- this is not the time the problems with Jones was coming about. This was some earlier time?
**A. I don't know exactly what day that she went to see all that. You would have to look in the other people's notes who interviewed that staff member. I don't know when that was honestly.**
Q. All right. So what you're telling me is that



when you say uncomfortable with black and nonwhite people, the context you remember is that she herself -- did you understand she went voluntarily? Nobody told her to go?
**A. Yes.**
Q. She went voluntarily to a diversity office and she wanted to learn how to relate better to blacks and nonwhites. That's the context?
**A. Correct, yes.**
Q. Is it possible -- let me just ask you this: Is it possible that you misunderstood and what she told you was that there was a -- do you remember her mentioning a Middle Eastern professor who was mistreating an African-American? Do you remember her mentioning that?
**A. I do.**
Q. Is it possible that that's the context in which she went to the diversity?
**A. That was not my understanding.**
Q. I know, but is it possible that you misunderstood and that's the context in which she went?
**A. I suppose anything is possible.**
Q. Y'all don't record these meetings, correct?
**A. No. The EORC side doesn't. The Title IX**



**side does.**
Q. Well, in this case there's no tape recording so what --
**A. There's not.**
Q. -- we have to rely on would be your notes and her recollection and the other committee members notes?
**A. Yes. Mine, Gray's, and I believe Kimberly's. We were all on it together.**
Q. Look at the very first page of your notes.
**A. Okay.**
MR. WATKINS: Is this 240, Jim?
MR. WAIDE: Yeah.
Q. (Mr. Waide) This says, Heard Lesha was treated badly by -- tell me what -- read the note and then tell me if you understand what this means.
**A. Okay. That's where all that -- that was the very beginning of the conversation, so those two things -- yes, she said she heard Lesha -- this was -- I think Lesha -- now, she didn't have a lot of great things to say about Lesha.**
MR. WATKINS: Jim, real quick, I have hard copies I printed out. I'm going to let her look at that instead of staring at my computer screen.
**A. So, yeah, this one -- this was where she**



**mentioned Middle Eastern person was at the beginning of this interview. I did remember her saying something about that. Mickey -- Mickey McLaurin -- that would be -- the PI, that would be whatever -- you probably know. Primary investigator. So in every research project there's a primary and a -- I think it's primary. I don't know what the word is. Treated Lesha poorly in the past. So this is all the -- this happened at the beginning. Those two things, yeah. I remember --**
Q. (Mr. Waide) I understand. You've got the two -- there's two different places anyway in the report. But my question --
**A. Correct.**
Q. My question is this is notes that Renita -- according to your notes it said -- are you saying Renita had heard that Lesha was treated badly?
**A. Right.**
Q. By whom. It says PI. Who is that?
**A. A PI. So there is, like, investigators. So when they do these research projects, they have to work with P.I. And I think it's, like, primary investigator. I may have the verbiage wrong here. But every research -- when the university gets money, there is an investigator that is designated as the**

**primary or whatever, and I think that would be a PI. So their office had to work with these people who got grant money.**
Q. Okay. So what Renita Gray told you was, according to your notes, that she had heard that Lesha -- is Lesha black or white?
**A. Black.**
Q. Lesha -- and I'm just --
**A. She no longer works there, yeah.**
Q. Lesha, a black -- who is a black employee, just for the record --
**A. Yes.**
Q. -- was treated badly by some of the PI's. Usually those of Middle Eastern dissent. Do you see that?
**A. That's what she said. That's right. Middle Eastern culture.**
Q. I'm sorry. Middle Eastern culture. So Renita Gray, who's been accused of being a racist or having --
**A. No one said she was a racist.**
Q. Oh, they didn't? Being uncomfortable with black people? She's being accused --
**A. That's correct.**
Q. -- of being uncomfortable with black people.



**A. Yes.**
Q. Had just told y'all -- was this at the first of the interview or is it the first of the report? It must be the first of the interview. Do you know?
**A. This would have been at the beginning of the interview. Are you talking about in my notes?**
Q. Yeah.
**A. That would have been one of the first things she started talking about.**
Q. She's talking about the fact -- she's making this report that a black employee may have been treated badly by people of Middle Eastern dissent?
**A. That's correct, yes. Middle Eastern culture.**
Q. Do you remember whether it was a particular person she talked about, a particular professor?
**A. I think she was talking about them as a general group because she said treated PI's. It was multiple people, PI. She said the Middle Eastern, usually men, would be treating Lesha -- like, it was a way that they addressed her based on their culture. That was my interpretation.**
Q. Let me ask you: Is that true? Have you found that some of these Middle Eastern people seem to be -- well, part of their religion is to discriminate against women, isn't it? That's a common thing that



happens? It's part of their culture. They're second class citizens?
**A. I wouldn't comment on that. I mean --**
Q. Well, I mean, that's a fact, isn't it? I mean, that's not in dispute.
MR. WATKINS: Object to form. Jim, you can't ask her to speak for somebody's entire religion.
Q. (Mr. Waide) Do you -- I'm just asking what you understand. You do have an understanding that it's just a fact of life that people who -- that live in the Middle East, that some of the people at least that live in the Middle East believe for religious reasons that women are second-class citizens or maybe lower than --
**A. I believe that people in all kind of cultures may believe that. I don't think it's -- I've worked with many people from the Middle East that have been in the United States, and they did not behave that way. Can I say that there are some people that hold those values? Sure. There's probably those people, but I don't know that the entire culture would feel that way and treat people that way. That seems like an overstatement. Let me just say that.**
Q. Okay. Would you be perfectly -- well, I don't want to get argumentative about it. If I was a



woman I wouldn't want to live in Saudi Arabia, but maybe you would. I --
**A. I agree. I understand that. We're not in Saudi Arabia, though. Most of the people that we worked with understood, you know, the values and they were happy to be here. I had really positive experiences with most of the people from the Middle East that I worked with.**
Q. Well, anyway, she --
**A. I can speak to that.**
Q. Here's what we know, then, from these notes so far. We know that Lesha had made some report about -- not Lesha. Ms. Gray had made some report about Lesha being reportedly treated badly by some people of Middle Eastern culture.
**A. Well, all I see in my notes is that she heard she had been treated badly, and Mickey told her that Lesha had been treated poorly in the past.**
Q. I see. Who is Mickey?
**A. Mickey McLaurin. He would have been -- I don't what his role is with her honestly, but he's in that research area too. He was one of the -- I think he and Greg -- I don't know if he reported to Greg or vice versa. I honestly can't remember.**
Q. We've earlier established that she went to

the diversity committee -- well, at least we know she went to the diversity committee for some reason, and I guess we're in debate about what. But we agree that she went to the diversity committee, according to your notes, at some earlier occasion.
**A. Yeah.**
Q. And also, according to the notes, she reported alleged bad treatment of a black female employee. We know that that's in your notes, those two things?
MR. WATKINS: Object to the form.
**A. I mean, I'm sorry. I missed the question.**
Q. (Mr. Waide) We know that in your notes -- at the very least, in your notes we know that your notes contain a notation that Ms. Gray had reported alleged bad treatment of a black female?
MR. WATKINS: Jim, I object to the form. That's not what the note said and that's not what Honey just testified to. She's answered that question.
Q. (Mr. Waide) Let me read to you exactly. Is this contained in your notes? Her and Lesha treated badly by PI's, usually those of Middle Eastern culture. Is that in your notes?
**A. Uh-huh (yes). Yes, that is.**



Q. Is it also in your notes that at some point in time earlier than when you were interviewing her, she had gone to the diversity office to seek some type of advice; is that correct? Is that in your notes?
**A. Yes. I think I see -- I think that was what she was referring to, yes.**
Q. I'm going to try to read this writing and see if there's anything else I want to ask you about.
**A. What's interesting -- well, I'll let you ask your question.**
Q. You go ahead. You can point out something if you want to point out. Go ahead.
MR. WATKINS: Is there a question on the table?
MR. WAIDE: No. She said --
**A. I'll just wait for your question because I'm just looking at mine and -- I don't want to --**
Q. (Mr. Waide) Okay. I'm trying to read your writing here a little bit. Give me just a minute. Let me go off the record and I'll see if there's anything else in these notes I want to ask you about, and I may be done.
(Short recess).
Q. (Mr. Waide) Let me ask you just a couple of follow-up questions. Let me make sure I've



understood. You did not review any documents in preparation for your deposition. Is that what you said; am I correct?
**A. I did not.**
Q. So today we've looked at your report and we've looked at your notes. Those are the two things we've looked at?
**A. Correct.**
Q. And I know you haven't had much time during this deposition to look at it very thoroughly, but you have glanced at your notes anyway and your report, and we've talked about a few specifics.
**A. Yeah. I've glanced at them, uh-huh (yes).**
Q. But one of the things during the course of this deposition I understood you to say is that you never have claimed Ms. Gray was a racist; am I correct? Did you say that?
**A. That is correct.**
Q. Now, do you claim that she treated Mr. Jones in a racist fashion?
**A. That is not what we said at all. It was that she was discriminating. If you read -- let me look at -- whatever it says in my report, that's -- it's the totality of the circumstances that she was treating people differently based on race. That is what my**



**report said.**
Q. Let me stop you --
**A. That doesn't mean she's a racist. That means that --**
Q. The only person that's made a complaint is Mr. Jones. That was Mr. Jones' complaint that's here, correct?
**A. Correct.**
Q. She's never been given notice she's mistreated anybody other than Mr. Jones? She's never been told she's being charged with that, has she?
**A. Not --**
MR. WATKINS: Object to the form.
You can answer.
**A. Not to my knowledge, no.**
Q. (Mr. Waide) What is it -- did you conclude that she had mistreated Mr. -- well, did you conclude that she had mistreated Mr. Jones based on his race?
**A. Not mistreated. Treated differently from the other employees. And if you read the report, it's that the totality of the circumstances was that she had treated him differently based on race.**
Q. Were there any other employees as bad as Mr. Jones in the office?
**A. I'm sorry. You mean as -- you're talking**

**about as disruptive or as difficult as him?**
Q. Yes, ma'am.
**A. Not that I heard, no.**
Q. And so you concluded that the way Mr. Jones was being treated was based on his race rather than the fact that he was disruptive and a problem employee; am I correct?
**A. The specifics in the report -- well, I think that he was probably treated differently with the -- I think it was the cameras that were placed up. There were some things he was being treated differently, yes.**
Q. Hold on just a second. The cameras were -- let me stop just a minute. Jones, who was a disruptive employee, according to you --
**A. Yes.**
Q. -- was treated differently than other employees based on his race and it's not based on the fact that he was a disruptive unsatisfactory employee; am I correct?
**A. Well, yes. I think our concerns were more that she was discriminating based on race and we had concerns with her as a supervisor, if that makes sense. Nobody said that she should lose her job. So, yes, I believe he was treated differently based on**



**race. I can't -- that rallied with him being a disruptive employee, yes. I can say that, yes.**
Q. My tendency -- I guess I'm a racist too because my tendency is if an employee is a bad employee I tend to treat them worse than a good employee.
MR. WATKINS: Object to the form. You need to ask her questions.
Q. (Mr. Waide) Does that prove racism, in your opinion?
MR. WATKINS: Jim, you need to ask her a question. You're not -- you're characterizing yourself there.
Q. (Mr. Waide) Here's what -- I don't understand how you reach the conclusion that the way she's treating Mr. Jones is not based on the fact that he's a problem employee. It's based on the fact that he's black. How did you reach that conclusion?
**A. I think in my report -- let me refer to my report. I believe I kind of spell this out in my report. I would rather do that than try to answer your question on the fly because I don't know what my conclusions were, Mr. Waide. I'd have to look at that.**
Q. Let me ask the question: And if you want to



read your report, you can, but let me make sure as we sit here today. As you recall -- and you can look at your report and say why I decided Mr. Jones was being mistreated based on his race. But as you sit here today, you can't remember why you decided it was because of his race instead of being his poor performance?
**A. I put in that report, and this is why I want to look at the report, that there were difficulties with his work. And then I looked at the things that were problematic in the behaviors of Ms. Gray, who I was investigating, not Mr. Jones, to see whether or not I thought that the way he was being treated would have been different from another employee, and that was my conclusion. But again --**
Q. Before you look at the report, let me ask you this question. It didn't make any difference to you whether he was a problem employee or not; am I correct?
**A. Correct. That was -- I put in my report that there were obviously problems with his performance. If you read the report, those things were considered. There was no doubt -- and to be quite frank with you, when I got -- when I had the conversation with her, I understood that. It was the totality of the**



**circumstances and her comments during that interview that led to our conclusion.**
Q. Do you think his previous -- you didn't form any opinion whether the previous employer was mistreating him because of his gender or race, did you?
**A. That was not what we were investigating.**
Q. Well, according to your report you were. It says you were.
**A. I'm sorry?**
MR. WATKINS: Object to the form.
Q. (Mr. Waide) Look at the first page of your report.
**A. You're -- the first page of the report, yes. I don't know what you're talking about.**
Q. Look on page -- Bates Page 56. Just read those first four lines. It looks like you started out investigating the progressive discipline that the previous employee had given him.
**A. And again, I think this would be a great question for Billy. I think that they were going back to review the issues that he had with Dr. Hodge-Penn to see if they were the same issues that he was having with Renita. Now, had this been an HR investigation or had somebody kept better notes, maybe they would**

**have -- he would have been removed as an employee. I think if there had been job action taken, if somebody had the appropriate notes, if his evaluations had been more thorough, if they wanted to fire him because of his work product, I don't think anybody would have questioned that. I think it was the way that this was handled with him and then that's why it came to our office.**

**So I think Billy would probably have reviewed the progressive discipline notes from Dr. Hodge-Penn to see if they were the same issues. I mean, this was -- it looks like from what I can read this was -- he came in and out of the office. I'm sure there were a lot of things that were reviewed. I did not review those.**

Q. (Mr. Waide) Well, we just don't have any record before us. You don't have one and I'm telling you I don't have one of anything other than -- what his complaint was other than y'all say he had a complaint. I haven't ever seen it.

MR. WATKINS: Jim, if we've got an issue with what you've been produced and what you haven't, you and I can take that up. Honey didn't have anything to do with that. She's not a university employee.



MR. WAIDE: Let me ask you something. Would you be willing to voluntarily give me this charge that is referred to in the report?

MR. WATKINS: What are we talking -- I'm sorry? Say that again. Are you talking to me or the witness?

MR. WAIDE: I'm talking to you. I'm just asking you whether you would be willing to give me the charge that was made by Jones? It says it's here. Do you not have it either?

MR. WATKINS: Are you talking about where it says filed a complaint against his supervisor?

MR. WAIDE: I should have said complaint rather than charge. I'm just asking you, Paul, do you not have that yourself either?

MR. WATKINS: I don't -- as I'm sitting here looking at this, I don't know if there's a document that is a complaint.

THE WITNESS: It most likely would be an email. I don't think it would be, like, a set report. If there was, I would say it would be more of I wish to file a complaint or something in an email because that's how some people --

MR. WAIDE: We talked about due process earlier, and one of the things about due process is



giving the defendant or the respondent -- I guess you call him the respondent -- notice of the charges against him. And if I understand the way y'all did, you gave him a summary of what -- this three or four page -- this charge of discrimination or pay equity or -- she didn't ever actually get the charge itself?

**A. As far as process of the unemployment side, I think you could ask Kim how they're cited. On the Title IX's side, again it's very different because it's regulated. There's a lot of things we have to, by regulation, give them that I don't know on the employment side are required. So that would be a question for Kimberly.**

Q. But y'all give them -- on your side of it you would give them a written notice of the charges?

**A. Like, for sexual harassment, things like that, yes, we have to give them -- it would have to be a document.**

Q. And why is that? Why would you give them a document, give them written notice of the charge? Why would you do that?

**A. It's just -- because there's Title IX regulations, and it's in the regulations.**

Q. As a lawyer, don't you know that it's a fundamental requirement of due process that you get



written notice of the charges?

MR. WATKINS: Object to the form.

**A. I wasn't acting in that capacity at the university. So again, that be would be a question for Kimberly. We did it on the Title IX side because of the regulations.**

Q. (Mr. Waide) Not because of the United States Constitution?

MR. WATKINS: Object to the form.

**A. To be quite frank with you, I always let people know what the allegations were before they came to our office and whether or not they wanted an advisor because that's the Title IX process. It's not the same with this process.**

Q. (Mr. Waide) I was going to give you -- you wanted to look at your report to review it for the purpose of showing why you believe that the way she treated Jones was because of race and not performance. So if you want to take some time and point that out to me we can do that now.

MR. WATKINS: Jim, I think her answer was that the report speaks for the conclusions that were made. I mean, that is what I heard.

**A. Yeah. That honestly -- I don't -- I can't sit here today almost two years later and tell you**

**exactly the basis of it. I try to be pretty thorough in my reports on why we came to the conclusions. So whatever you see in the report, that was my opinion at the time. I honestly cannot answer that question right now because I do not remember.**

Q. (Mr. Waide) I know, but you have the report there before you.

MR. WATKINS: No, she doesn't. I have my computer here before me, and I'm not really in the practice of getting exhibits ready for counsel opposite before a deposition to show the witnesses in my office.

MR. WAIDE: We just emailed it to you. Can you not show her that?

MR. WATKINS: I'm looking at it. I asked you to email it to me so we could confirm that you were asking questions about the same document, but I did not receive ahead of the deposition documents that you asked me to print out and show her. I mean, I did you the courtesy of showing particular paragraphs on my screen as you were asking about them. I'm not going to sit here and scroll through and ask her to read every one of them.

MR. WAIDE: I'm not asking you to scroll through. I'm just asking you to show her the document



that we emailed you, the charge.

MR. WATKINS: Yeah. I'm looking at it on my computer screen right now.

MR. WAIDE: Can you show her the physical document that we emailed it to you?

MR. WATKINS: I don't have that physical document.

MR. WAIDE: We just emailed it to you.

MR. WATKINS: You want me to print it out and show to her? Is that what you said?

MR. WAIDE: Either that or take the email that we just sent you.

MR. WATKINS: Are we making this an exhibit to the deposition?

MR. WAIDE: It's Exhibit A to the previous deposition, the one yesterday.

MR. WATKINS: And you want to mark it as an exhibit to this deposition?

MR. WAIDE: Either way. We can just refer to Exhibit A from yesterday's deposition. That's what I would like for her to see.

**A. Well, then, if that's the way y'all want to do this, y'all can refer to Exhibit A from yesterday's deposition. I honestly -- this has been so long ago I can tell you what I remember and don't remember. The**



**conclusion and how I wrote it is going to be the basis for whatever decision we came to, and I think we had a conversation about it. I know my boss, Kimberly DeVries, would have been involved in that conversation.**

MR. WAIDE: Let me ask you this, Counsel. Are you saying you are not willing to print out, if necessary, Exhibit A to the deposition from yesterday and let her see it?

MR. WATKINS: Jim, I just emailed it to my assistant to ask her to print it out. I don't have a printer sitting next to me in the conference room. You didn't ask me to do that ahead of time, so I've sent it to her. I will ask her to bring it in and you can ask the witness a question about it.

MR. WAIDE: Thank you very much. Let's take a short break and that will be my last question and we'll be done as soon as you've looked at the report.

(Short recess).

MR. WATKINS: Jim, she's got that document.

Q. (Mr. Waide) This is what I'm trying to understand. What is it in the document in your report, which was Exhibit A to plaintiff's deposition



which is -- first of all, do you recognize this being the findings of the Equal Opportunity and Regulatory Compliance regarding the complaint made by Mr. Jones against Ms. Gray? Is that what that is?

**A. That is what that is.**

Q. Now, is there something you could point to in this document that shows -- that indicates that the way Ms. Gray treated Mr. Jones was because of his race and not because of his performance?

**A. I'm going to say -- I'm reading -- trying to read through this, sorry, quickly. The last paragraph, it says --**

Q. What page are you on?

**A. Six.**

Q. Bates Page 66?

**A. I don't know. Oh -- let me see. No, 60.**

Q. Okay.

**A. Yeah, 60.**

Q. Try to identify where you're reading from, if you would.

**A. Well, so it -- the last -- the paragraph right before findings, I mean, that whole -- the analysis, all that is going to give you the best overall -- actually, you know what? It's going to be the whole thing because --**

**So there's pay equity issues. I think I talk about in this too. And if you'll look at that whole analysis on Page 59, the pay equity issue, said they approve the increase in pay for the new hires. All of that talks about they raised valid concerns about his communications skills with others, particularly those in authority. He was out of the office. So those all talk about the issues with Dr. Jones.**

**So we talk about -- because he was talking about pay equity, and we found that there was nothing there. Ability to work remotely. He had complained about that, so we addressed that.**

Q. Stop just a minute. Are you saying that she was basing any problems he had of work --

**A. Oh, no, no, no. I'm just going through, like, Dr. Jones. Sorry. So what it says in the last paragraph is probably going to be where you get the most, on Page 60. It says, Although Ms. Gray may have race neutral reasons for the pay equity issues and valid concerns with Dr. Jones' work habits and communications, they have not been articulated well.**

**Further, Ms. Gray's comments are also concerning as to whether she can manage these issues without considering race. The cameras in the**



**building, while perhaps necessary, were only placed after she suspected two black employees of a break-in, which as Dr. Jones pointed out, was not reported to the police, and would see the necessary files and information are valued.**

**And I put -- of course, I put that her comments were part of that as in the paragraph before, and the relationship between them hinders the ability for either to feel comfortable without communicating without a third party. One witness stated that she has her favorites and she takes a harsher tone when communicating with Dr. Jones. Her relationship and comments around other black employees has also made them feel uncomfortable, and that's problematic. So there were other black employees that said she did seem to treat black and nonwhite -- and I think there were other people who were also white that said they felt as though some of her comments and the way she treated black employees -- you would have to look at all of that -- was different.**

**So it's different treatment based on race. Basically treating somebody differently based on race. So it's all in the report. That's all there. That's the basis.**

Q. What you're saying is, if there's some



evidence that her treatment of Jones was based on his race instead of being based on his performance, then it's in the report; is that right. It's in this report we're looking at?

**A. Everything should be in the report.**

Q. Exhibit A? You're talking about Exhibit A to the plaintiff's deposition?

**A. Exhibit A. I guess whatever you're talking about from the hearing yesterday, I wasn't in that one -- yes. Exhibit A, correct. Yes. I see that.**

Q. The one you have before you right there?

**A. That's correct. Everything should be in that report that you need.**

Q. So far as you know -- well, strike that. Do you know anything about how Jones did after he got a new supervisor after Ms. Gray was removed as his supervisor? Do you know how he did that after that?

**A. I do not. I want to say I left -- what year was this? Yeah. No, I have no idea. I believe he reported to Dr. Easson, so he would have to tell you that.**

Q. Okay.

MR. WAIDE: Thank you very much. That's all I have.

(Off record discussion).



EXAMINATION

BY MR. WATKINS:

Q. I just want to ask clarifying questions and make sure we're talking about the same thing, Ms. Ussery. You earlier looked at a set of handwritten notes that have the Bates labeled UM240 through UM246, right?

**A. That's correct.**

Q. And when we were talking about your notes, that's the document you were talking about, correct?

**A. That's correct.**

Q. Thank you. And after -- did you keep possession of those notes after you left the university?

**A. No.**

Q. So you didn't produce those in this case?

**A. I did not.**

MR. WATKINS: I want to go ahead and mark this as I guess exhibit A to this deposition.

LuAnne, I can email you the documents.

Q. (Mr. Watkins) Did you take these notes during the meeting that you had with Ms. Gray?

**A. I did.**

Q. Did you go back and change the notes after that meeting?

**A. No.**
Q. Are the notes as you have reviewed them in the same order as the closed conversation that you had with Ms. Gray?
**A. It is.**
Q. Do you understand what I'm asking?
**A. I do.**
Q. So the notes are toward the beginning are capturing things that happened toward the beginning of that interview, and the notes at the end are capturing things that happened at the end of that interview; is that correct?
**A. That's correct.**
Q. You were asked by Mr. Waide some questions about statements in your note -- now I can't find it again. So this is on Page 242. I think you identified the statement, very uncomfortable with black or nonwhite people. Did I read that correctly?
**A. That's correct.**
Q. And that's what we were talking about earlier?
**A. Uh-huh (yes).**
Q. I want to make sure that I understand what you were telling Mr. Waide about that statement. What is your recollection of the question that you asked



that got that response from Ms. Gray that you heard that?
**A. So it was towards the end of the interview and I said -- somebody had mentioned that she was not comfortable with black and nonwhite people, so I said, What is your comfortability with black or nonwhite people, and that was the response.**
Q. Okay. Is that a question you've asked other people during investigations?
**A. Yes. Not necessarily in that phrase, but yeah.**
Q. When you were writing portions of the report that you wrote -- and I understand your testimony is you didn't write all of that report, correct?
**A. Correct.**
Q. Did you fabricate any of the contents of that report?
**A. No.**
Q. Did you make anything up?
**A. No.**
Q. Did you fabricate anything that you were writing down in your notes?
**A. No.**
Q. To the best of your knowledge, is there anything in these notes that is not correct?



**A. No.**
Q. Okay. When you wrote the report, was it your intention to write a report that was more favorable to Dr. Jones because he was black?
**A. No.**
Q. Was it your intention to write a report that may have been not as favorable to Ms. Gray because she was white?
MR. WAIDE: Object to the form.
**A. No.**
MR. WATKINS: That's all the questions I have. And I will email you 240 to 246 here in just a second once I get that document.
(Exhibit No. 1 was marked.)
(Deposition concluded at 11:35 a.m.)



C E R T I F I C A T E
STATE OF MISSISSIPPI )
COUNTY OF LEE )
RE: ORAL DEPOSITION OF HONEY USSERY

I, LuAnne Funderburk, CCR 1046, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 14th day of May, 2026.

____________________________
My Commission Expires: CCR 1046
April 18, 2027 Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RENITA GRAY PLAINTIFF
VS. CAUSE NO. 1:24-CV-191-SA-DAS
BOARD OF TRUSTEES OF THE STATE
INSTITUTIONS OF HIGHER LEARNING
FOR THE STATE OF MISSISSIPPI D/B/A
THE UNIVERSITY OF MISSISSIPPI DEFENDANT

CERTIFICATE

I, Honey Ussery, have read the foregoing pages, 1-63, of the transcript of my deposition given on April 2, 2026, and it is true, correct and complete to the best of my knowledge, recollection and belief except for the list of corrections, if any, attached on a separate sheet herewith. Witness my hand, this the_____ day of _______________, 2026.

___________________________
Honey Ussery

CERTIFICATE

Subscribed and sworn to before me, this the ___________ day of _______________________, 2026.

___________________________

My Commission Expires:_________ Notary Public in and for the County of __________________ State of Mississippi



LF REPORTING
P.O. BOX 2996
TUPELO, MISSISSIPPI 38803

CORRECTION LIST

Renita Gray
vs.
Board of Trustees of the State Institution of Higher Learning for the State of MS
Northern District - Federal 1:24-CV-191-SA-DAS

CAPTION
April 2, 2026 Honey Ussery

| DATE OF DEPOSITION | | DEPONENT'S NAME |
|---|---|---|
| PAGE LINE | CORRECTION | REASON |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

___________________________
Honey Ussery