IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RENITA GRAY PLAINTIFF

VS. CAUSE NO. 1:24-CV-191-SA-DAS

BOARD OF TRUSTEES OF THE STATE INSTITUTIONS OF HIGHER LEARNING FOR THE STATE OF MISSISSIPPI D/B/A THE UNIVERSITY OF MISSISSIPPI DEFENDANT

*****************************************************

ZOOM VIDEOCONFERENCE DEPOSITION OF KIMBERLY DEVRIES

*****************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFF
IN THE LAW OFFICES OF WAIDE & ASSOCIATES, P.A.
332 SPRING STREET, TUPELO, MS
ON APRIL 2, 2026, BEGINNING AT 11:50 A.M.

(APPEARANCES NOTED HEREIN)

Reported by: LUANNE FUNDERBURK, CCR 1046

---

LF REPORTING
P.O. BOX 2996
TUPELO, MS 38803
(662) 871-5419



APPEARANCES:

For the Plaintiff:
JIM WAIDE, ESQ.
Waide & Associates, P.A.
P. O. Box 1357
Tupelo, MS 38802
(662) 842-7324
waide@waidelaw.com

For the Defendant:
PAUL BOWIE WATKINS, JR., ESQ.
Mayo Mallette, PLLC
5 University Office Park
2094 Old Taylor Road, Suite 200
Oxford, MS 38655
(662) 236-0055
pwatkins@mayomallette.com

Also Present: Renita Gray, Plaintiff



TABLE OF CONTENTS


| WITNESS | PAGE |
|---|---|
| KIMBERLY DEVRIES | |
| Examination by Mr. Waide................. | 4 |

| EXHIBITS | |
|---|---|
| 1 Handwritten Notes UM218-239............. | 34 |




KIMBERLY DEVRIES, after being duly sworn, testified as follows:

EXAMINATION

BY MR. WAIDE:

Q. Would you state your name, please, ma'am?

**A. Kimberly DeVries.**

Q. Spell your last name for me, please.

**A. D-E-V-R-I-E-S.**

Q. Do you work currently at the University of Mississippi?

**A. I do.**

Q. Have you looked at any documents in order to prepare for this deposition?

**A. Yes.**

Q. And what documents have you examined?

**A. I looked at the notes that I took. I looked at the report that was written in this case. I looked at the two reports that our office prepared that also involved Renita Gray. And in sending over the information, I looked at the notes that my colleagues had taken in the report.**

Q. Of those things that you looked at, you said the report that was done in this case. Are you referring to about a six-page document that's labeled as Exhibit A at the bottom? Is that what you're

EXHIBIT "16"

talking about?
**A. I don't know how it's labeled. Yes.**
Q. That's what you looked at to prepare?
**A. That's right.**
Q. Have you looked at anything else?
**A. Just the other documents that I just mentioned.**
Q. I understand. The notes of yourself and everybody else?
**A. Yes, and the other reports that our office wrote involving Renita.**
Q. I'm sorry. Let me stop you just a minute. Are there reports other than that exhibit before you there that's labeled Exhibit A that your office issued involving -- charging Renita with something?
**A. Yes.**
Q. What -- tell me what reports you're talking about now. I'm not familiar with what you're talking about.
**A. One of them was an allegation, a complaint by Lesha Agnew, who was a different UM employee, and the other was a complaint involving Latanya Dixon, another UM employee.**
Q. Are these complaints that these two employees wrote?



**A. No. They were reports that we wrote -- our office wrote in response to complaints they filed with my office.**
Q. That brings me to my question here. Is there a written report that Mr. Jones made, a written charge or complaint that he filed?
**A. I'm not aware of one. I don't know.**
Q. All right. When y'all do an investigation like the one we're talking about here today, do you not get a written complaint from somebody that's complaining before you do your investigation?
**A. We don't require the person complaining to put it in writing, so I don't recall whether Dr. Jones did that or not. Sometimes people do. Sometimes we just interview them and use the notes from that conversation.**
Q. Let me look at Exhibit A. I think you have that before you?
**A. Uh-huh (yes).**
Q. Look at the first paragraph. Well, first of all, let me just establish this for the record. At the time, were you chairperson of the Equity Opportunity and Regulatory Compliance committee?
**A. It's not a committee. I was the director of the office, but yes.**



Q. I'm looking at this Exhibit A to the Gray deposition, which you've identified as being the report -- well, what is that? What is Exhibit A that you're looking at there?
**A. It's a report that Equity Opportunity and Regulatory Compliance office wrote in response to Dr. Jones' complaint against Renita Gray.**
Q. Well, look in the third line.
**A. Yes.**
Q. The second and third line, and I'm reading from the second line. It says, Ventez Jones, ..., filed a complaint against his supervisor, Renita Gray. Is that incorrect or you just don't know?
**A. No, that's correct.**
Q. So where is it? When you said filed a complaint, that implies to me there's a document. Am I wrong? Should that just say he made an oral complaint?
**A. We would use that language that he filed a complaint whether he submitted a written document or whether he just came to our office and said he wanted to move forward with a complaint.**
Q. So the answer to the question is you don't know whether there even exists a written charge filed by Mr. Jones?



**A. I don't know whether he brought a written document to our office. That's correct.**
Q. I assume y'all must have a file on Mr. Jones there somewhere?
**A. We do.**
Q. And you didn't look at that before the deposition?
**A. I looked at it sometime ago. I didn't look at it in the last couple of -- like, to prepare today.**
Q. So your testimony today is that this investigation of Ms. Gray, there may or may not have been a written complaint made before y'all did the investigation?
**A. There may or may not have been a written complaint. That's right.**
Q. And it says it was based on gender and race, whether it was written or verbal?
**A. That's right.**
Q. And in your complaint -- turn over to Page 8. It actually goes back to the -- the next page, Exhibit A, whatever the complaint is, whether it was written or whether it was verbal, it actually went back to complaining about the previous supervisor, Ms. Penn, correct?
**A. You said Page 8?**

Q. I'm sorry. I probably said it wrong. It's Page 2 of Exhibit A.
**A. Can you ask the question again?**
Q. Whatever the complaint Jones filed, whether it was written or whether it was oral, began with complaining about a previous supervisor, not Ms. Gray, but somebody supervising him previously, correct?
**A. That's right, yes.**
Q. Was that Ms. Penn?
**A. Dr. Hodge-Penn, yes.**
Q. Is she black?
**A. Yes.**
Q. Read that first paragraph. You just read it to yourself. We won't put it in the record. Just read the first -- on Page 2 of Exhibit A, and it's the paragraph there about Jones.
**A. (Witness reviewing document) okay.**
Q. Rather than ask you a leading question, I'd rather you just put it in your own words. Just describe how Jones acted regarding his complaints from the time he first filed his complaint. Just describe what he would do or what his actions were.
**A. So just to clarify, I wouldn't have been involved in all of the meetings with him. So I'm aware of what I was shared from the folks in my office**



**who were in those conversations and then those folks who wrote this report.**
Q. Did you play any role in writing this report?
**A. I did not.**
Q. But somebody --
**A. I would have edited the report, but I did not write it.**
Q. But somebody in the report wrote in the report that Jones would make a complaint and then he would want to stop it or withdraw it, and then he would come back and begin it again. And he started out complaining about his first supervisor, who was black, and then he started complaining about Ms. Gray?
**A. Are you asking me --**
Q. Yeah. I'm just asking you if that's a summary of it. That's what somebody in your office wrote?
**A. Yes. That's right.**
Q. I assume y'all talked to various people as you did your investigation? I would assume you did, correct?
**A. Yes.**
Q. Did you form an impression as to what kind of employee Mr. Jones was? Was he good employee or a bad employee?



**A. I don't know that it was that simple, but I wouldn't have also been involved in all of those interviews.**
Q. Well, what was your -- did you have any opinion whatsoever about Mr. Jones as an employee?
**A. Sure, yes.**
Q. What was your opinion?
**A. There was a lot of feedback related to him being challenging with supervisors. That he asked lots of questions, often sought to clarify things in a way that I think frustrated supervisors, multiple supervisors. And he was inconsistent in his dealings with our office as far as follow-up, which is what's in that paragraph.**
**I don't remember that I was in any specific meetings with him. I met him. I don't remember being in any specific meetings with him, so that was really the extent of my impression.**
Q. All right. Did you talk to any supervisors of Ms. Gray? Any of her supervisors?
**A. Did I or did our office?**
Q. Did your office?
**A. Yes.**
Q. Can you remember who y'all talked to?
**A. At one point we talked to Josh Gladden, who**



**was the person who was in the -- who supervised Renita, but I don't remember when he left. There was a lot of movement in that area. I don't remember when he left compared to when Renita came in. Honey spoke to -- or someone in our office, I believe it was Honey, spoke to Greg Easson, who took that role in an interim capacity, and I know that he intersected with Renita.**
Q. So Gladden and Easson then, do you remember what their opinions were of Ms. Gray?
**A. To be honest with you, I don't remember talking to them specifically about that.**
Q. Do you remember either supervisor either you talked to or anybody in that office talked to that claimed that there was anything wrong with Ms. Gray's job performance?
**A. No. I don't remember them talking about anything wrong with her performance in the job, no.**
Q. So would it be fair to say in this case you were investigating a lady, who so far as you know and during the investigation, didn't have any problems with job performance, and you were investigating a complaint made by Mr. Jones, who apparently had lots of problems with job performance. Would that be a fair statement?

**A. I don't know that I can speak to the truth of him having lots of problems with job performance.**
Q. Well, Ms. Gray is not the only one that -- well, let me ask you this: In the course of your investigation did you learn, for example, one thing he was doing was working remote?
**A. Yes.**
Q. Did you recall that he had gone, like, from November to March when he didn't come into work, worked entirely in remote?
**A. I don't recall the time period, but I do remember there was a period of time that he was working remotely, yes.**
Q. Do you remember that both Ms. Gray and his supervisors were trying to get him to come back to work?
**A. I remember Ms. Gray was. I don't remember who all was involved with it.**
Q. And you remember that one of the allegations made against him was that he would come into work and sit out in -- or drive around and wouldn't come into work. He would drive around, said he couldn't find a parking place, so he claimed to be at work, but would be out driving around and wouldn't come into the office to work? Do you remember that?



**A. I wouldn't call it an allegation because it didn't come up within our investigation, but I do remember Ms. Gray saying that, yes.**
Q. But you didn't look into it?
**A. That wouldn't have been within the scope of what we were investigating.**
Q. I see. In other words, y'all weren't investigating whether Jones was a good or bad employee?
**A. That's right.**
Q. Let me ask you something. Jones was claiming he was being mistreated, wasn't he?
**A. He was claiming he was being discriminated against, yes.**
Q. Treated differently than other employees?
**A. That's right.**
Q. But so far as you know, isn't it true that he was -- that one of the other employees that was as bad as he was, so far as being insubordinate and not doing his job and being a difficult employee to supervise. Isn't that true?
**A. I wouldn't characterize it that way, no.**
Q. You would not? You think Jones -- you think all the employees were just as bad as Jones?
MR. WATKINS: Object to the form.



Go ahead and answer if you can.
Q. (Mr. Waide) What other employee would you say was as bad as Jones?
**A. It wouldn't have been within the scope of our investigation to make a judgement as to whether he was a good or bad employee. Typically, if a supervisor in responding to our investigation alleges that there is some performance concern, alleges some concern with the person's quality of their employment, we would either refer that somewhere else, to HR, or we would say -- we would include it if it's relevant to why they responded to the employee the way that they did.**
Q. All right. So what you're telling me is that when an employee claims that he is treated differently, it's not relevant to you as to whether or not that particular employee was an especially poor employee who wouldn't do the things a supervisor wanted him to do? That didn't make any difference to you; am I correct?
MR. WATKINS: Object to form. That's the opposite of what she just said.
You can answer if you can.
Q. (Mr. Waide) I'll rephrase it, then. Is one of the things he was making that he was being mistreated by Ms. Gray? Is that what he was saying,



she was treating him differently than other employees?
**A. Yes.**
Q. Are you testifying it's not relevant to you as to whether or not he was, in fact, a bad employee as compared to other employees? That would not be relevant to you?
**A. No. I don't think it's that simple. It might be relevant if that explained why a supervisor was responding to the employee the way that they were.**
Q. You took -- the best record we would have is the notes that you took? Would that be the most accurate record of what you found so far as your personal knowledge?
**A. Yes. Or the -- as far as my personal knowledge, yes.**
Q. All right. Would you pull out your notes and -- they're kind of hard to read, so Ms. Gray has typed them up for me so I probably have -- or she's given her interpretation of what they say. So read them carefully and let me make sure that what your notes indicate that you observed about the interview with Ms. Gray.
**A. This is my notes from April 23, 2024?**
Q. Yes, ma'am.
**A. All right.**

MR. WATKINS: Jim, are you asking her to read all of the notes?
MR. WAIDE: No. It would take too long to do that. I'm just going to ask her about if I'm accurate about reading what she says.
MR. WATKINS: Okay.
Q. (Mr. Waide) It starts out by saying that -- this is what Ms. Gray is saying. Became aware soon after cam. What is cam?
**A. Came. Came into my office.**
Q. That Lesha -- who is Lesha?
**A. Lesha is Lesha Agnew. She was the -- she was the complainant in a different investigation.**
Q. Is she black or white?
**A. Black.**
Q. Was treated -- I mean was treated terribly by a researcher of Middle Eastern dissent. Did I read that correctly?
**A. Researcher is what's written, right.**
Q. The next phrase says of Middle Eastern dissent, doesn't it?
**A. Yes.**
Q. So Ms. Gray told you that Lesha, a black person, was being treated terribly by a person -- a researcher of Middle Eastern dissent?



**A. That's correct, yes.**
Q. And then she says -- the next phrase says, I said something about how nice the PI was. Mickey said no, you don't know how he's treated Lesha in the past. What are you talking about there?
**A. That she had said something -- she, Renita Gray, had said something about now nice a PI, a principal investigator, on a project was, and Mickey -- somebody else in the office said, no, you don't know how he's treated Lesha in the past.**
Q. So she's reporting that Mickey had said that this person of Middle Eastern dissent had mistreated Lesha in the past, correct?
**A. That's right.**
Q. So essentially, then, the interview starts out in essence with Ms. Gray making illusions to or allegations that a black employee has been treated badly, at least according to Mickey she had been treated badly?
**A. I don't know for sure that that was how we started. That's when I started taking notes is that was the part I was there to focus on. But, yes, that is something she left with, from my -- what I remember.**
Q. Now, the next thing, what it says is, asked



Lesha if she would go meet with me and Jazmine Kelley. Is that Ms. Gray saying that, that Ms. Gray asked Lesha if she would go meet with her and Jazmine Kelley?
**A. Yes.**
Q. And did you -- the notes are here and they say what they say, but did you understand that this is Ms. Gray proposing a meeting with Ms. Kelley?
**A. Yes.**
Q. Does Ms. Kelley work in diversity?
**A. She did. She doesn't anymore.**
Q. Because they closed the diversity department?
**A. Well, we did, but she also doesn't work at the University of Mississippi anymore.**
Q. And look down about -- several notes, but down three or four lines later it says, went to meet with Jazmine and asked to be coached. Do you see that? Is that Ms. Gray saying she went to meet with Jazmine and asked to be coached?
**A. I'm not -- oh, yes. Hold on. Yes.**
Q. So do you understand from that Ms. Gray saying that at some previous time she herself had gone to the diversity office and asked for the diversity office to coach her?
**A. I don't actually remember if it was a**



**previous time or if it was in the context of the conversation with Lesha. But, yes, it was my understanding that she had gone to that office, to Jazmine specifically, to ask to be coached.**
Q. Come on down further in your notes and there's a -- it's kind of hard to say where this is. It says EORC response, and down about five lines later it says, she knew that Melissa had a hard time and decided to get out. Do you see that?
**A. She said she and Melissa had a hard time, yes.**
Q. Who was she saying was giving Melissa a hard time?
**A. I don't recall her specifying. What I understood from that was that Melissa had a hard time in the unit.**
Q. That's the previous supervisor, correct?
**A. Melissa Hodge-Penn, yes.**
Q. So Ms. Penn had a hard time. Who did you understand was giving Ms. Penn a hard time?
**A. I don't recall her -- I don't recall understanding that she was referring to, like, a specific person. More, like, Dr. Hodge-Penn had a hard time in that unit.**
Q. Do you know of anybody -- well, you know Ms.

Penn filed a disciplinary action against Jones. You knew that she had done that from your report, correct?
**A. That's right.**
Q. Do you know of any other employee that Penn had a hard time with other than Jones?
**A. Do I know of any other employee that Dr. Hodge-Penn had a hard time with?**
Q. Other than Jones?
**A. I think it depends on what you mean had a hard time with. Dr. Hodge-Penn and I had talked about before she left about concerns she had within the unit, but it wasn't related to Renita Gray and it wasn't related to Ven Jones.**
Q. Did she say some employee was giving her a hard time?
**A. Related to her supervisor.**
Q. Her supervisor was giving her a hard time? Who was that?
**A. More complicated than that. Her supervisor at the time was Josh Gladden.**
Q. So she was complaining about Gladden?
**A. She wasn't directly complaining that he had done anything specific. It was the environment and the culture in the area that she was concerned about.**
Q. Is the only person she was complaining about



Josh Gladden?
**A. I don't recall her mentioning any other people, and our conversation was informal.**
Q. Go on down. It talks about a paperclip and a Cynthia Evans seeing a paperclip. Do you see that on down? Do you remember that discussion?
**A. I do remember that discussion.**
Q. Did that relate to why or one of the reasons why Ms. Gray believed that somebody had been going into the offices after hours, somebody probably was entering the offices?
**A. Yes. That was my understanding.**
Q. In some of the offices are their confidential materials that are confidential in some way that the public is not supposed to see?
**A. That's what Ms. Gray shared, yes. I don't know all of what they had, but that's what Ms. Gray shared, yes.**
Q. On down there several lines later, it indicates that she -- it says, feel that it was Ven -- that means Jones -- that Ms. Gray thought -- Ms. Gray felt at least that Jones is a person that went into the office. Do you see that?
**A. I don't see that.**
Q. The line begins Lesha is highly emotional at



times. Comes across as anger. Feel that it was --
**A. Yes, I see.**
Q. All right. I'm sorry. I didn't mean to cut you off. And then it says -- somebody feels that Jones is the one that went into the offices. Is that Ms. Gray or do you know who you're talking about there?
**A. That was Ms. Gray.**
Q. Then there was a discussion about Sammi making a report that Jones -- who is Sammi? Do you know who that is?
**A. She was an administrative assistant, which I only know because of my notes. I don't recall apart from that.**
Q. Reported that Sammi, the assistant, saw Jones putting -- it says Ven, but Ven Jones -- putting something into his pocket. And she checked and found batteries were missing. Do you remember that?
**A. Uh-huh (yes). Yes.**
Q. And she discussed it with her supervisor, Josh, according to your notes on the next page?
**A. Yes.**
Q. And she went into Jones' office and tried to find the batteries and didn't find them, correct?
**A. That's what she shared. That's right.**



Q. This is not in your notes and you may not know. Do you know who had the authority to request cameras be installed? Who had that authority?
**A. I don't know.**
Q. Do you know who, in fact, requested cameras be installed?
**A. No.**
Q. Do not know?
**A. I don't know.**
Q. You are aware that cameras were installed in the hallways of two different floors? Are you aware of that?
**A. I recall talking about that, yes.**
Q. Does that have anything to do with your -- strike that. Is it your opinion that the problem between Jones and Gray was because of Jones' race and not because of Jones' performance? Is that your opinion?
**A. I think there were a lot of reasons for the problems.**
Q. Here's my question: Are you saying -- let me see if I understand that question. There were a lot of reasons for the problems between Jones and Gray?
**A. I do think that, yes.**
Q. And you think they do not relate to race?

**A. I wouldn't say that.**
Q. Well, do they relate to race? Were the problems because of race?
**A. I do think what was part of it, yes.**
Q. What else was it?
**A. I think his performance and the way that he engaged was challenging. I think there were things around the culture of the office that were difficult.**
Q. So what you're saying is that his performance caused his problems and also his race caused his problems; am I correct?
**A. I don't know I would say they both caused it. I think they were factors, yes.**
Q. Were there other factors other than his race and his performance?
**A. I mean, I think the culture of the office was challenging. I think there were a lot of people -- there was a lot of change. There was inconsistency in terms of leadership and who was there and what the expectations were from my perspective. But again, anything related to performance wouldn't have been ours necessarily in terms of the EORC. Wouldn't have been ours to address, so I don't know that I would have the full context of those pieces. I know what was shared with us.**



Q. I'm looking through the notes.
(Off record discussion).
Q. (Mr. Waide) Let me just ask you a question. I don't have -- in your Exhibit A there's a reference in there -- I won't turn to it, but it says something to the effect that Ms. Gray was very uncomfortable around blacks, something to that effect. Do you remember that?
MR. WATKINS: Let me point you -- I think you're looking at Page 234, Jim.
MR. WAIDE: Okay. Let her look at Page 234, then.
**A. Okay. I'm looking at it.**
Q. (Mr. Waide) Look back at your notes, and I was trying to find that in your notes.
**A. 234 is my notes, right? Is that what you're saying?**
Q. It may be. Wait a minute. No, that's not --
MS. GRAY: No, those are not hers. Her's are the ones you can't read.
Q. (Mr. Waide) I'm sorry. I had the wrong notes there.
(Pause in the proceedings).
Q. (Mr. Waide) Counsel just referred to Page 234 of your notes. Give me a minute and let me turn to



that.
(Pause in the proceedings).
Q. (Mr. Waide) I'm just going to put this in the record, and I'm just going to ask who you're talking about here. There's a note that says treating people differently because -- based on race. Is that a question somebody is asking or is that just something she said, I treat people differently based on race? What is that?
**A. No. That is not what she said. I don't recall if that was the question or if that was something that was said like that Honey would have asked. The next part is the question that I don't remember that, treating people differently based on race, I don't remember what -- who said that or what the framing of that was.**
Q. You think that relates to some question somebody asked?
**A. I'm not sure. It might have been a question. It might have been, like, a restatement of what the allegation was.**
Q. The next thing says, What's, and then it's got unknown. Do you have any idea what that's talking about?
**A. What's comfort.**



Q. It says what's C, and then it's got unknown.
MS. GRAY: No. I didn't know what it said when I typed it up.
MR. WAIDE: Oh, I'm sorry.
**A. My handwriting is bad. What's comfort is what I wrote.**
Q. (Mr. Waide) Oh, I see. You wrote the phrase, what's comfort?
**A. Yes. Question mark and then --**
Q. Then it says, very uncomfortable at a point?
**A. Yes.**
Q. Right? Do you --
**A. Correct.**
Q. -- have any recollection of what you meant by that?
**A. What's comfort was Honey's question around what Ms. Gray's comfort level was. It was in the context of race. And what I had was Ms. Gray's response was, very uncomfortable at a point.**
Q. In other words, you wrote down that what Ms. Gray said was, very uncomfortable at a point?
**A. Yes.**
Q. Is that all you wrote about -- let me finish. The exact language that you wrote in response to whatever question it was Ms. Ussery wrote was, quote,

very uncomfortable at a point. What can I say, blank. Until I went to grad school, first time I had friends of color. Hired someone of a different ethnicity. Veronica. Is Veronica black -- no, that's apparently your question. Is apparently she referring to Veronica and you said you were going to talk to Veronica? I'm not following that.
**A. I'm not sure what to respond to on that.**
Q. You just don't know what that note means?
**A. Which note?**
Q. The note says, hired someone of different ethnicity. Is that -- who is saying that, hired someone of different ethnicity? Is that you saying that or is that her saying that?
**A. It wasn't me asking the questions at that point. I believe it was Honey. My recollection is the question was, what's your comfort hiring someone of a different ethnicity. And Ms. Gray mentioned Veronica. And Ms. Gray said, is Veronica black. And said, talk to her if you haven't already.**
Q. In other words, in response to -- I'm rephrasing this. In response to Honey's questions, Ms. Gray had mentioned hiring somebody -- looks like your notes say of a different ethnicity?
**A. Ethnicity, yes.**



Q. And then somebody -- your notes ask if Veronica is black.
**A. That was what Ms. Gray said.**
Q. I see. And then the next thing -- I'm just looking at your notes. This is apparently quoting Ms. Gray. As a conservative Christian, I treat everyone the same. That's what Ms. Gray said, correct?
**A. That's right.**
Q. But you don't believe that, correct?
**A. I'm sorry?**
Q. You think Ms. Gray was lying about that when she said that?
MR. WATKINS: Object to the form.
Q. (Mr. Waide) When she said as a conservative Christian I treat everyone the same, it is your opinion that she was lying about that? She doesn't treat everyone the same?
**A. I certainly didn't think of her as lying about it, no.**
Q. So do you believe her when she said as a conservative Christian I treat everyone the same?
**A. I believed her when she said that is what she tries to do. Did I think there was evidence that that's not what happened? Yes.**
Q. There's a phrase down there that she has



biracial grandchildren. Do you see that?
MS. GRAY: Niece.
Q. (Mr. Waide) I'm sorry --
MS. GRAY: That was a friend of mine. That's an employee, not a friend. An employee of mine that -- I have a biracial great niece.
MR. WAIDE: I'm sorry.
Q. (Mr. Waide) I'm sorry. It says she has a biracial great niece, that she has a close relative, in other words, that's black. Do you see that?
**A. I missed the second part you said but, yes, I do see where she said she had a biracial great niece.**
Q. There's a note that says Ven, and I'm sure you mean Ven Jones, and I'll just read it. Ven is passive aggressive, insubordinate, constantly questions everything. Do you see that?
**A. Yes.**
Q. Is that what Ms. Gray said?
**A. Well, yes, continually, not constantly. But yes, that's what she said.**
Q. Do you have any opinion about whether that's true or not?
**A. I don't. And there were emails certainly indicating that he was frequently questioning things that Ms. Gray or others asked him to do.**



MR. WAIDE: Off record.
(Pause in the proceedings).
Q. (Mr. Waide) Now, here's a note that MHP -- you refer that to be Penn that says MHP?
**A. That was Melissa Hodge-Penn, yes.**
Q. Had said that she would rather do away with the position rather than continue to have him. Do you understand that to be Jones?
**A. Can I read that real quick?**
Q. Yes, please.
**A. Yes. I do think that would have been in reference to Dr. Jones, yes.**
Q. Did you talk to Penn? Did you ever talk to Penn about what she thought about Jones?
**A. I did not. I don't remember if in the investigation she was interviewed or not. She was gone from the university by that time, so I don't think so but I don't remember that for sure.**
Q. And you don't remember what the substance of Ms. Penn's complaints about Jones were when she gave the performance appraisal for him?
**A. We wouldn't have been involved with it at that point when Dr. Hodge-Penn was doing the performance issue.**
MR. WAIDE: Let me have just a minute. I

may be done.
(Pause in the proceedings).
MR. WAIDE: I don't have anything else.
(Pause in the proceedings).
Q. (Mr. Waide) Basically what you know about the case is what's contained in your notes. Am I correct about that?
**A. And in the report. I would have been -- like I said, I would have edited the report, but not wrote it, but yes.**
Q. What you know about the case is contained in these notes we just went over, and --
MR. WAIDE: Did we make them an exhibit, her notes?
MR. WATKINS: No. I would like to.
MR. WAIDE: Let's do.
MR. WATKINS: This is UM218 through 239 are her notes.
MR. WAIDE: If you would, can you email those to use so we'll make sure we've got the right one?
MR. WATKINS: Yes.
Q. (Mr. Waide) Let me just rephrase the question to make sure we're clear. What you know about this case is what's contained in your notes, which has just



been made an exhibit, and in the formal report which is marked as Exhibit A to the deposition yesterday? Am I correct?
**A. That's my understanding. Again, I had conversations with Ms. Gray in the context of other complaints, but it's my understanding that that's not at issue right now.**
MR. WAIDE: I don't have anything else.
MR. WATKINS: I don't have any questions for the witness. We will get that exhibit over to y'all.
(Exhibit No. 1 was marked.)
(Deposition concluded at 12:31 p.m.)



C E R T I F I C A T E
STATE OF MISSISSIPPI )
COUNTY OF LEE )
RE: ORAL DEPOSITION OF KIMBERLY DEVRIES

I, LuAnne Funderburk, CCR 1046, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 14th day of May, 2026.

______________________________
My Commission Expires: CCR 1046
April 18, 2027 Notary Public



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RENITA GRAY PLAINTIFF
VS. CAUSE NO. 1:24-CV-191-SA-DAS
BOARD OF TRUSTEES OF THE STATE INSTITUTIONS OF HIGHER LEARNING FOR THE STATE OF MISSISSIPPI D/B/A THE UNIVERSITY OF MISSISSIPPI DEFENDANT

CERTIFICATE

I, Kimberly DeVries, have read the foregoing pages, 1-34, of the transcript of my deposition given on April 2, 2026, and it is true, correct and complete to the best of my knowledge, recollection and belief except for the list of corrections, if any, attached on a separate sheet herewith. Witness my hand, this the_____ day of _______________, 2026.

_________________________
Kimberly DeVries
CERTIFICATE
Subscribed and sworn to before me, this the ___________ day of _________________________, 2026.

______________________________
My Commission Expires:_________ Notary Public in and for the County of __________________ State of Mississippi

LF REPORTING
P.O. BOX 2996
TUPELO, MISSISSIPPI 38803

CORRECTION LIST

Renita Gray
vs.
Board of Trustees of the State Institution of Higher Learning for the State of MS
Northern District - Federal 1:24-CV-191-SA-DAS

CAPTION
April 2, 2026 Kimberly DeVries

DATE OF DEPOSITION DEPONENT'S NAME
PAGE LINE CORRECTION REASON

Kimberly DeVries