**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**RENITA GRAY** **PLAINTIFF**

**V.** **CIVIL ACTION NO. 3:25-CV-134-MPM-RP**

**BOARD OF TRUSTEES OF THE**
**STATE INSTITUTIONS OF HIGHER**
**LEARNING FOR THE STATE OF MISSISSIPPI**
**D/B/A THE UNIVERSITY OF MISSISSIPPI** **DEFENDANTS**

# DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Renita Gray had a difficult working relationship with a Black subordinate employee at the University of Mississippi. That employee filed an internal race discrimination claim against her. Meanwhile, Plaintiff was already making plans to retire. The University's investigative report, issued months after Plaintiff had made her retirement plans known, stated that Plaintiff told the investigative team she was "very uncomfortable" working with Black people. The complaining employee was taken out of Plaintiff's chain of command. Plaintiff retired and left the University in January 2025.

Plaintiff now alleges that the statement attributed to her in the report was false, that University "forced" her to retire because of that false statement, and that the real reason for her departure from the University was her race. Plaintiff's claim fails on nearly every front. The record does not support her claim that she was forced to retire, as she had already confirmed those plans with her supervisor before the report was issued. The employee who filed the complaint against her is not an appropriate comparator because his situation was not "nearly identical" to hers. Most importantly, Plaintiff has come forward with no competent proof that any action taken by the University was motivated by her race. She has failed to identify a genuine issue of material fact, and the University is entitled to judgment as a matter of law.

## Facts

Plaintiff began working at the University in 2016 as the Manager of Sponsored Programs Accounting. In February 2023, she was appointed Interim Director of Sponsored Programs Administration. Ex. "1" (Gray Depo.), at 10:9-12:13. At the time of her appointment, Plaintiff understood that she might not be selected to be the permanent Director of Sponsored Programs when that position was filled. *Id*. at 28:6-22. During her tenure as Interim Director, Plaintiff supervised between fourteen and seventeen employees. *Id*. at 30:7-12.

### *1. Plaintiff's working relationship with Ven Jones*

Dr. Ventez Jones, who is Black, is a research administrator who was Plaintiff's subordinate during her time as Interim Director. Plaintiff testified that her predecessor, Dr. Melissa Hodge-Penn, warned her that Dr. Jones was dishonest, insubordinate, and frequently unavailable while working remotely. *Id*. at 31:16-33:22. Dr. Hodge-Penn told Plaintiff she placed Dr. Jones on a progressive discipline plan before she left.

Plaintiff had a difficult working relationship with Dr. Jones. Within weeks of starting as the Interim Director, she reprimanded him for hostile and insubordinate behavior and extended his discipline plan. *Id*. at 56:23-57:19. When Plaintiff's department was given permission to work remotely one day a week, she claims Dr. Jones angrily confronted her because he was dissatisfied with the day of the week she had assigned him. *Id*. at 42:2-15. She claims he took time off without having it approved in advance and that other coworkers reported that he was not helpful. *Id*. at 100:1-101:1. Plaintiff also claims that Dr. Jones, who commuted to Oxford daily from Memphis, did not come to the office between November 2023 and March 2024 because of alleged "car troubles," despite numerous attempts on Plaintiff's part to contact him. *Id*. at 46:13-49:7. Plaintiff reported the issues she had with Dr. Jones to her supervisor Dr. Greg Easson, then

the Interim Vice Chancellor for Research and Sponsored Programs, nearly every time she met with Dr. Easson. *Id*. at 97:1-23.

***2. Plaintiff's Bell's Palsy***

Plaintiff started experiencing symptoms of Bell's Palsy on April 16, 2024. Ex. "2" (Email from Gray to Swider); Ex. "1" (Gray Depo.), at 206:25-207:3. The condition lasted six to eight weeks, after which she recovered and experienced no recurring symptoms. Ex. "1" (Gray Depo.), at 110:1-111:23; 113:5-10. Plaintiff's doctor could not tell her what caused the onset of this condition, but she believes the stress of working with Dr. Jones was the precipitating factor. *Id*. at 114:21-115:16; 228:15-21.

***3. Plaintiff's retirement plans***

Plaintiff told colleagues by early April 2024 that she intended to retire in early 2025. On April 2, 2024, she told a fellow University employee that she already had a "retirement plan" and that she had asked Dr. Easson to tell Dr. Noel Wilkin, the University's Provost, that she "may be leaving in January 2025." Ex. "3" (Email from Gray to King). That same day, April 2, she told an employee of Huron Consulting Group: "I have decided to retire from Ole Miss in January 2025 and will take some time off prior to seeking a remote position." Ex. "4" (Email from Gray to Zuskar). Plaintiff "was hoping [she] could get a job with Huron" after her retirement. Ex. "1" (Gray Depo.), at 204:7-10.

Plaintiff continued to make plans for her retirement after she was diagnosed with Bell's Palsy. The University's HR Director contacted Plaintiff on April 17, 2024, expressing concerns that Plaintiff's timekeeping requirements for her exempt employees could lead to FLSA violations. Ex. "5" (Email exchange between Gray and Jekabsons). Plaintiff, who understood the HR complaint had come from Dr. Jones, responded to HR:

> I cannot be successful in improving the research effort on this campus without support, therefore, I have an appointment in early May with my primary care physician to go on FMLA. I will be requesting to utilize my leave as soon as possible to lead up to my 60th birthday on January 8, 2025, and will be retiring after that. Hopefully, the hard work and long hours I have given to UM through my time here will allow me this concession. If not, I will be working up until the first day I become retirement eligible. Leaving a job undone is nothing I have ever done elsewhere, but now I must. It is most certainly not how I envisioned ending my career.

*Id.*; *see also* Ex. "1" (Gray Depo.), at 187:18-188:7. The HR Director responded the next day:

> Hello Renita
>
> I was unaware of the state of the tensions growing within ORSP. I can imagine that it has been stressful. Dr. Juawice McCormick and I are available to meet with you tomorrow morning to listen and offer help with navigating the situation. Juawice was an excellent resource to HR when we were in flux.

Ex. "5" (Email exchange between Gray and Jekabsons). Dr. McCormick, the Director of the University Counseling Center, also responded that she was available the next day. *Id*. Plaintiff never scheduled that meeting. Ex. "1" (Gray Depo.), at 194:9-195:3.

Dr. Easson, who had been copied on the original April 17 email, responded to Plaintiff on April 19, acknowledged that her working relationship with Dr. Jones was causing her stress, and told her to "[t]ake some time to relax and get past the Bell's palsy and then we can talk more about how you want to proceed." Ex. "2" (Email exchange between Easson and Gray). Plaintiff responded the same day and said "[t]hanks for your response, but at this point, I cannot continue when [Jones] is allowed to undermine me as director through all UM channels, yet I as a director have no real recourse where he is concerned." She continued: "Between that and the issues others within SPA have with me and my decisions, ***I feel it is best for all concerned to retire and move on***." *Id*. (emphasis added).

Plaintiff met with Dr. Easson about her retirement plans on May 14, 2024, and reported to three of her employees the same day that she had made the decision to retire:

**From:** Renita L Gray <rlgray1@olemiss.edu>
**Sent:** Tuesday, May 14, 2024 1:14 PM
**To:** Mickey McLaurin <mclaurin@olemiss.edu>; Anita C Randle <acr@olemiss.edu>; Cynthia Evans <evanscb@olemiss.edu>
**Subject:** CONFIDENTIAL EMAIL

I met with Greg earlier today and have agreed to step back as Interim Director of SPA. The new VCRED will be involved with hiring a permanent Director starting July 1st. I have agreed to stay on as Interim Associate or Assistant Director until my retirement in January.

I am not discussing this publicly until the new VCRED is announced, which may not occur as soon as we originally envisioned.

Know that this was my decision to make, and I am happy to step back from the stress and daily drama. I will be available to assist the new Director get acclimated to the position and will hopefully assist in SPA's continued success.
Renita

Ex. "7" (Email exchange between Gray and Evans); *see also* Ex. "1" (Gray Depo.), at 197:16-198:12.

She confirmed those plans in an email with another University colleague on May 16, 2024:

> BTW – it hasn't been announced yet, but the permanent director position will be posted soon. ***I do not plan to apply***. I will step into an interim Asst. Director position until I turn 60 in January and then I plan to retire. Stick a fork in me, I'm DONE!

Ex. "8" (Email from Gray to Swider) (emphasis added). She told another colleague the next day: "I am retiring in January 2025." Ex. "9" (Email from Gray to Nicholas). On May 23, she told yet another colleague: "I am planning to retire sometime in early 2025." Ex. "10" (Email from Gray to Williams).

Plaintiff was contacted on May 20 by a recruiting firm about a potential position as Vice President of Research at another university. She responded on May 29: "I appreciate this information, but I am not interested in a new position. I am planning to retire in January 2025

and would only be interested in providing consulting services or remote work at that time." Ex. "11" (Email from Gray to Micciche).

### *4. EORC Complaint and Investigation*

In late 2023 or early 2024, Dr. Jones complained to the University's Office of Equal Opportunity and Regulatory Compliance ("EORC") that Plaintiff was discriminating against him because of his race and sex. Ex. "12" (EORC Report), at 1. Among other things, Dr. Jones alleged that several newer hires were paid more than him, that he was not allowed to attend as many conferences as other employees, and that cameras were installed in the departmental office building when Plaintiff suspected him of breaking into offices. *Id*.

EORC formally notified Plaintiff of its investigation into Dr. Jones' internal discrimination complaint, as well as another former employee's allegation of discrimination against Plaintiff, in an email on April 22, 2024. Ex. "13" (Email exchange between Gray and Ussery). While Plaintiff had been aware of an EORC investigation "through the grapevine," she had not been contacted by EORC before that time. Ex. "1" (Gray Depo.), at 232:6-10.

Plaintiff met with three white EORC employees on April 23 or 24, 2024 – Honey Ussery, Kimberly DeVries, and Grey Young. The EORC employees asked Plaintiff questions about the allegations made by Dr. Jones. *Id*. at 141:5-23. All attendees at the meeting agree that Plaintiff told the investigators that she was "very uncomfortable" about something. Plaintiff, who did not take notes at the meeting, claims she said she was "very uncomfortable" about being accused of discrimination and being interviewed. *Id*. at 156:15-157:15. Each of the three investigators testified, based on their personal recollections and their contemporaneous handwritten notes, that Plaintiff said she was "very uncomfortable" specifically in response to a question about her comfort level working with Black people. *See* Ex. "14" (Ussery Depo.), at 26:19-21; 32:3-5; Ex.

"15" (Ussery Notes Excerpt); Ex. "16" (DeVries Depo.), at 28:1-22; Ex. "17" (DeVries Notes Excerpt); Ex. "18" (Young Depo.), at 7:22-8:4; Ex. "19" (Young Notes Excerpt).

Plaintiff received a copy of EORC's investigative report on June 6, 2024. Ex. "20" (Email from Ussery to Gray). The report found Plaintiff had "admitted when asked if she was comfortable around Black and non-White people that she was 'very uncomfortable' and had sought help with it from the University's Division of Diversity of Community Engagement." Ex. "12" (EORC Report), at 6. The report found insufficient evidence to substantiate Dr. Jones' claim of sex discrimination, but it found sufficient evidence to find that Plaintiff engaged in race discrimination in violation of the University's Non-Discrimination and Sexual Harassment Policy. *Id*. The report concluded Plaintiff had treated Dr. Jones differently than other employees expressed doubts "as to whether she can manage these issues without considering race" in light of her comments. *Id*.

The EORC report recommended that Plaintiff "be removed from all supervisory roles within ORSP" and that, if that could not be done, that "Dr. Jones should have an alternative reporting structure…." *Id*. The report further recommended that Plaintiff attend training "to gain assistance on how to work better with people of different ethnicities and backgrounds." *Id*.

Plaintiff appealed the EORC findings to Dr. Wilkin, who denied her appeal and found that the investigation and conclusions were "reasonable and appropriate." Ex. "21" (Provost Letter). Dr. Wilkin also noted that "the recommendation that the complainant report to a different supervisor seems warranted (whether or not there was a finding of a policy violation) given that both of you are uncomfortable communicating without a third party present," and he concluded that Plaintiff's supervisor (Dr. Easson) "has the authority to make decisions about which actions to take to mitigate the concerns raised and supported by this investigation." *Id*.

Dr. Jones' complaint was not the only allegation of race discrimination that EORC received from University employees working under Plaintiff. Lesha Agnew and LaTanya Dixon, both of whom are Black, also alleged that Plaintiff had discriminated against them because of their race. Ex. "22" (DeVries Declaration). EORC investigated these complaints during the same time it was investigating Dr. Jones' complaint, and it concluded in both cases that there was not sufficient evidence to conclude that Plaintiff had engaged in race discrimination. *Id*.

***5. Plaintiff's retirement.***

After Dr. Wilkin denied Plaintiff's appeal, Dr. Easson rejected EORC's recommendation to remove Plaintiff from her supervisory role. Instead, he removed Dr. Jones from her chain of command and assumed responsibility as Dr. Jones' immediate supervisor. Ex. "23" (Easson Memo). He laid out his plans for the department in a memo to the Provost, which was consistent with his May 14 discussion with Plaintiff:

> The hiring of a permanent Director of SPA has been planned for some time. Renita Gray has made clear her intention to retire in early 2025 and with the arrival of a new Vice Chancellor Dr. John Higginbotham, now it the time to post this position and begin the hiring process. The process of posting this position and creating a search committee has begun, with the goal of having candidates for interviews with the new VC in late September and a new Director SPA by November 1, 2024. Ms. Gray would then move into the vacant Assistant Director of SPA position and work to ensure a smooth transition to the new Director of SPA. Ms. Gray would then retire in early 2025 as planned.

*Id*. Plaintiff retired from the University in January 2025.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue of material fact is genuine only if a reasonable jury could return a verdict for the nonmovant. *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 248 (1986). Plaintiff's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (citations omitted). The moving party is not required to present evidence proving the absence of a material fact issue; rather, the moving party may meet its burden by simply "pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).

## ARGUMENT

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff alleges she was forced to leave her position as Interim Director because of her race. Compl., at ¶ 8 [1].

To establish a prima facie claim for race discrimination under Title VII, Plaintiff must show:

> that [s]he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (quoting *Stroy v. Gibson*, 896 F.3d 693, 698 (5th Cir. 2018). The employer must then articulate a legitimate non-discriminatory reason for the challenged action. *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 874 (5th Cir. 2019). If the employer meets this burden of production, "the burden shifts back to the plaintiff to demonstrate that the proffered nondiscriminatory reason is a mere pretext for

discrimination or that the plaintiff's protected characteristic was another motivating factor for the action." *Stelly v. Dep't of Pub. Safety & Corr. La. State*, 149 F.4th 516, 522 (5th Cir. 2025) (citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011)). Plaintiff cannot establish a prima facie case of discrimination, and she has offered no proof that her departure from the University was because of her race.

***1. Plaintiff cannot show an adverse employment action.***

While a plaintiff need not show an "ultimate employment decision" to make out a prima facie case of discrimination, *Hamilton v. Dallas County*, 79 F.4th 494, 497 (5th Cir. 2023), she "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Plaintiff alleges:

> Because the EORC compliance committee found that Plaintiff made a racist statement, the position of Director of the Program where Plaintiff worked was advertised. Although she was interim director, Plaintiff was not able to apply for the position because the committee instructed that Plaintiff could not supervise the employee who initiated the baseless claim. The false allegation caused Plaintiff extreme stress. Furthermore, the Interim Vice Chancellor, Easson, instructed Plaintiff to retire, and stated that Plaintiff would be allowed to do so effective January 2025. At his instruction, Plaintiff tendered her resignation. This resignation was not voluntary, but was a forced discharge.

Compl. At ¶ 7 [1]. The record does not support these allegations, and Plaintiff cannot establish a prima facie case of discrimination because she voluntarily retired from her position as Interim Director.

First, Plaintiff was aware that the University would be seeking to fill the permanent Director position before the June 6 EORC report. She testified that Dr. Easson told her the position was being opened during their meeting on May 14. Ex. "1" (Gray Depo.), at 196:9-197:1.

Second, Plaintiff had decided not to apply for the permanent position before the June 6 EORC report. Ex. "7" (Email exchange between Gray and Evans); Ex. "8" (Email from Gray to Swider).

Third, the record does not support Plaintiff's allegation that Dr. Easson ordered her to retire because of the June 6 EORC report. Plaintiff initially testified at her deposition that Dr. Easson instructed her to give him a retirement letter "multiple times between June 6 after the EORC [report] and up until the time I gave it to him at the end of July." Ex. "1" (Gray Depo.), at 182:15-17. When asked to identify the first time Dr. Easson gave her that directive, she testified "[s]ometime at least three to four times between June 6 and July 31st." *Id*. at 182:25-183:1.

In fact, as discussed above, Plaintiff had been planning to retire for months before the June 6 report. She had told Dr. Easson by April 2 that she was considering retirement in January 2025. Ex. "3" (Email from Gray to King). On April 17, she told the University's HR Director, unsolicited, that she intended to retire because of a perceived lack of "support" from the University. Ex. "5" (Email exchange between Gray and Jekabsons). When the HR Director and the Director of the Counseling Center offered to meet and support her, she rebuffed them. *Id*. When Dr. Easson told her to "take some time" to think about whether she intended to retire and that she would "have [his] support for whatever decision [she] ma[d]e," she immediately responded: "I feel it is best for all concerned to retire and move on." Ex. "6" (Email exchange between Easson and Gray).

She had not changed her mind on May 14, when she met with Dr. Easson to formalize her retirement plans. Ex. "7" (Email exchange between Gray and Evans). She then volunteered this information to several subordinates and insisted it was "[her] decision to make." *Id*. After the May 14 meeting, but before the June 6 report, she jokingly told another colleague to "[s]tick a

fork in me, I'm DONE!" Ex. "8" (Email from Gray to Swider). She even turned down an opportunity to interview for a more prestigious position at another university, expressly because she was already planning to retire. Ex. "11" (Email from Gray to Micciche).

When confronted with these facts at her deposition, she changed her story and admitted that she had discussed a retirement date with Dr. Easson before the EORC report was completed:

> Q. But you told Greg on May the 14th that you were going to move into this other role and retire in January.
>
> **A. And he kept requesting something of that nature from me.**
>
> Q. But –
>
> **A. Even at this time. I believe now that I read this, this was when he had been requesting this on separate occasions and –**
>
> Q. So, --
>
> **A. -- there it was.**
>
> Q. -- are you changing your testimony?
>
> **A. No.**
>
> Q. Okay. Because earlier you testified that he requested your resig -- your retirement date several times specifically after June 6th.
>
> **A. And now I see this, I guess I am. I didn't realize the date because this is the date that he started asking for that. I – I – it's been too many years for me to be able to definitively tell you dates. I assumed it was after the June 6th but it was not.**
>
> Q. Okay. So y'all were having a conversation about your retirement before the EORC report came out?
>
> **A. We were having a conversation about non-support about Ven which might cause me to retire because of the impact on my health.**

Ex. "1" (Gray Depo.). at 200:25-201:20.

Plaintiff struggled to explain the contradiction. She first claimed she had simply *lied* to her employees about her intent to retire in the May 14 email, either to protect office morale or to "save face" because she was embarrassed that there was an ongoing EEOC investigation. *Id*. at 199:24-200:13; 202:1-16. She did not, however, lie about meeting with Dr. Easson that same day. That meeting did happen, and they did discuss her retirement. *Id*. at 199:19-7.

She also maintained that her earlier talk of retirement shouldn't be taken seriously because it was "[d]uring a time of Bell's palsy when I was emotional" and that she would have changed her retirement plans once her health improved. *Id*. at 192:24-193:6; 202:17-203:15. However, the Bell's Palsy symptoms did not start until April 16, Ex. "2" (Email from Gray to Swider), two weeks after she told a consultant she intended to retire in January 2025 and take some time off before seeking a remote position. Ex. "24" (Email from Gray to Zuskar).

When asked why she would have been discussing retirement *before* the onset of her Bell's Palsy, she testified she was "very nervous about everything going on with EORC" because she perceived that office "would not let me reprimand Ven in the way that I thought I should be able to…." Ex. "1" (Gray Depo.), at 212:12-15. This concern apparently arose from a conversation with an HR representative in which Plaintiff was told she could not retaliate against Dr. Jones because he filed a complaint with EORC. *Id*. at 116:15-119:10.

Even as she tried to explain away her emails, Plaintiff ultimately admitted that Dr. Easson began asking for her retirement date when she told him of her plans to retire in April, not after the EORC report in June:

> **But that does not mean I was going to – these are all with people that do not matter. It's – the one with Greg, that was a discussion with Greg and he was the only one that really knew what was going on. He was the one that was actually – I hate to say this, hurting the situation even more by *asking me for a date for retirement when I mentioned it in April and he continued asking me for a date.***

*Id*. at 12:18-25 (emphasis added).

Plaintiff claim is that, but for the June 6 EORC report, she would have not only changed her mind about retirement, but in fact decided applied for the permanent Director position. This claim is speculative, implausible, and inconsistent with the evidence. The record reflects that her retirement was set in motion by her own words and actions, not that it was a "forced discharge." She cannot make out a prima facie case of race discrimination because she was not subjected to an adverse employment action.

***2. Plaintiff cannot identify a comparator.***

Plaintiff's prima facie case also fails because she cannot show "she was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Ernst*, 1 F.4th at 339. Plaintiff has not alleged that her replacement was outside her protected class, and the record contains no proof that Plaintiff was treated less favorably than any similarly situated University employee.

A plaintiff offering a fellow employee as a comparator must show that the employee was treated differently "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). This requirement "ensures that disparate disciplining of the plaintiff and comparators supports an inference that racial discrimination, rather than some other difference in employment circumstances, is the reason for the different consequences." *Patrick v. Walmart, Inc.*, 859 F. App'x 687, 688 (5th Cir. 2021) (citing *Lee*, 574 F.3d at 259-60). "[E]mployees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." *Lee*, 574 F.3d at 259-60.

Plaintiff claims Dr. Jones is a proper comparator. Ex. "25" (Pl's Discovery Responses), at 6. Plaintiff also testified Dr. Jones was treated more favorably than her because EORC was "protecting him over me as a white woman" and "sid[ing] with a black over me as a white female." Ex. "1" (Gray Depo.), at 158:19-21; 168:4-7. Dr. Jones is not an appropriate comparator. First, Plaintiff and Dr. Jones did not have similar work responsibilities – she was his supervisor. *See Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (holding that subordinate employees not proper comparators); *Vess v. MTD Consumer Grp.*, 755 F. App'x 404, 408 (5th Cir. 2019) (holding that other employees not comparators where plaintiff occupied "position of leadership" and was "held to a higher standard of conduct"). Nor were Plaintiff and Dr. Jones in similar circumstances. She did not file an EORC complaint against him, and there was no proof he said he was uncomfortable working with people of other races. *See Vaughn*, 665 F.3d at 637 (noting that, unlike plaintiff, proffered comparator "apparently never made racial, religious, or political comments in workplace conversations with subordinates").

Plaintiff cannot satisfy the fourth prong of her prima facie case, and the Court should dismiss her claim.

***3. Legitimate nondiscriminatory reason.***

Even if the University had "forcibly discharged" Plaintiff as she alleges, there would have been a legitimate nondiscriminatory reason for doing so. The EORC report concluded that there was sufficient evidence to conclude Plaintiff had discriminated against Dr. Jones because of his race. Ex. "12" (EORC Report), at 6.

Plaintiff disagrees with this conclusion, and she maintains she did not tell the EORC investigators that she was "very uncomfortable" working with Black people. However, the University has only the "burden of production, not persuasion" at this stage. *Vaughn*, 665 F.3d at

636 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Even if the EORC investigators were wrong, the University is "allowed to be incorrect in its assessment of the facts…." *Vaughn*, 665 F.3d at 636. The University would have been justified in taking an action with respect to Plaintiff's employment with the information it had.

***4. Plaintiff has offered no proof that her departure from the University was because of her race.***

Because the University has articulated a legitimate nondiscriminatory reason, any presumption of discrimination dissipates. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). To avoid summary judgment, Plaintiff must offer sufficient evidence to create a genuine issue of material fact either that the University's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the University's reason, while true, is only one of the reasons for its conduct, and another motivating factor is Plaintiff's protected characteristic (mixed-motives alternative). *Id*. (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004)). Under either framework, Plaintiff maintains the "ultimate burden of proving intentional discrimination." *Davis v. Farmers Ins. Exch.*, 372 F. App'x 517, 519 (5th Cir. 2010) (citing *Laxton*, 333 F.3d at 578). She has failed to do so.

This case does not neatly fit within the *McDonnell Douglas* framework because Plaintiff voluntarily retired and because the EORC report was not, in and of itself, an employment action. However, Plaintiff appears to plead this as a "pretext" case rather than a "mixed motives" case, as she alleges that the findings of the EORC report were false. Compl., at ¶¶ 6-7 [1]. This distinction can be important, as it can mean a plaintiff has chosen to forego the more forgiving "motivating factor" causation standard. *See Adams v. Mem'l Hermann*, 973 F.3d 343, 352 (5th Cir. 2020) ("Proof of causation under the 'motivating factor' standard is generally viewed as an

alternative to the but-for standard."). The Court need not parse these causation standards in this case because Plaintiff has presented no proof of intentional discrimination.

It is undisputed that Dr. Jones made a race discrimination claim against Plaintiff. It is undisputed that the EORC investigators interviewed Plaintiff and other witnesses as part of that investigation. It is also undisputed that Plaintiff told the investigators she was "very uncomfortable" about something during her interview. The only dispute is whether Plaintiff said she was "very uncomfortable" about the investigative process, as Plaintiff claims, or that she was "very uncomfortable" working around Black and non-White people, as reflected in the testimony and contemporaneous notes of all three investigators.

However, even if the Court assumes that the investigators were incorrect about Plaintiff's statement and that the statement in the EORC report was tantamount to an adverse employment action, "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision." *Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (holding that "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination).

Plaintiff told the EEOC that she thought the EORC investigators "either misunderstood and misstated what I said or they purposely falsified the statement I made." Ex. "26" (EEOC rebuttal letter). When asked directly whether the EORC investigators misunderstood her or intentionally falsified her statement, she testified that "she d[id]n't know what their mindset was" and that she simply "assumed that they purposely misstated that because that was the only way they could come up with something to side with a black over me as a white female." Ex. "1" (Gray Depo.), at 167:11-168:12.

Pressed for details, Plaintiff testified that she thought the "charge of [the EORC] office, per se, is to protect minorities and women," and that, while people of any race can submit complaints to EORC, she does "not believe that they do their due diligence in investigating claims against white people." *Id*. at 168:8-169:23. Plaintiff's only example of this alleged bias was that the EORC report stated that Plaintiff and Dr. Jones had given different dates for when Dr. Jones returned to work after his car troubles. *Id*. at 169:24-172:10. However, the report did not make a finding as to which witness' recollection was correct, Ex. "12" (EORC Report), at 4, and Plaintiff has pointed to no other proof that the investigators discounted anything she said because of her race. This is not evidence of race discrimination.[1]

In fact, Plaintiff's suggestion that EORC's investigations were conducted in a way that favored Black complainants is not even consistent with how it handled *other race discrimination allegations made against Plaintiff herself*. That office was investigating two other race discrimination complaints against Plaintiff from Black employees at the same time it investigated Dr. Jones' claims. Ex. "22" (DeVries Declaration). When it concluded those investigations in April and August of 2024, EORC found insufficient evidence that Plaintiff had discriminated against either of those two employees. *Id*. If, as Plaintiff claims, the outcome of an EORC investigation is probative to the question of whether the University discriminated against the accused employee, the proof is not on her side. No reasonable juror could conclude that EORC tipped the scales against Plaintiff because her accuser was Black when it dismissed allegations made by two other Black accusers at nearly the same time.

---

[1] Plaintiff also suggested that one of the EEOC investigators acted improperly in a different investigation involving an accusation of rape by a female student against a male student. *Id*. at 158:25-161:7. Plaintiff said she thought the investigator "did not use due process" in that case based on an internet article she read, but she could not remember the details. Plaintiff has not explained what that case has to do with her allegation of race discrimination.

What's more, the *act of discrimination* Plaintiff alleges is a step removed from the *employment action* she alleges. Plaintiff has never alleged that Dr. Easson, the white supervisor who she claims directed her to retire, harbored any discriminatory animus. She has not disputed that, as Dr. Wilkin told her, Dr. Easson was ultimately responsible for deciding how or whether to implement the EORC recommendations. Ex. "21" (Provost Letter). However, she has come forward with no proof to support a "cat's paw" theory. *See Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) ("Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker – the person who took the adverse employment action – harbored any retaliatory animus."). Under that theory, Plaintiff would have to show not only that the EORC investigators harbored discriminatory animus, but also that they "possessed leverage, or exerted influence, over" Dr. Easson such that he became the instrument of their animus. *Harmon v. Collier*, 158 F.4th 595, 616 (5th Cir. 2025) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004). There is no proof that happened here.

Plaintiff's claim of race discrimination is based entirely on her own speculation and conclusory assertions about the University investigator's motives. Without any proof of discriminatory intent, any proof that the EORC investigators incorrectly memorialized Plaintiff's comments "would establish only that the proffered justification was mistaken, not dishonest, which is the key to pretext." *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 564 (5th Cir. 2019) (quoting *Easterling v. Tensas Par. Sch. Bd.*, 682 F. App'x 318, 323 (5th Cir. 2017)). Plaintiff's claim should be dismissed because the record contains no proof that the University intentionally discriminated against her because of her race.

## CONCLUSION

Plaintiff is offended that Dr. Jones accused her of race discrimination, and she does not believe she said what the three white EORC investigators heard her say. This is not proof of intentional race discrimination. Plaintiff has failed to come forward with proof that she was discharged, that she was treated differently because of her race, or that the statements in the EORC report were motivated by her race. Her claim should be dismissed in its entirety.

THIS, the 1st day of June 2026.

Respectfully submitted,

**BOARD OF TRUSTEES OF THE STATE INSTITUTIONS OF HIGHER LEARNING FOR THE STATE OF MISSISSIPPI D/B/A THE UNIVERSITY OF MISSISSIPPI**

*/s/ Paul B. Watkins, Jr.*
PAUL B. WATKINS, JR. (MB No. 102348)
*Attorney for Defendants*

OF COUNSEL:

MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
*pwatkins@mayomallette.com*