**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**RENITA GRAY** **PLAINTIFF**

**v.** **CAUSE NO. 3:25-cv-134-GHD-RP**

**BOARD OF TRUSTEES OF THE STATE INSTITUTIONS OF HIGHER LEARNING FOR THE STATE OF MISSISSIPPI d/b/a THE UNIVERSITY OF MISSISSIPPI** **DEFENDANT**

---

# PLAINTIFF RENITA GRAY'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [38]

---

## I. Introduction

This case is before the Court on the Motion for Summary Judgment [Doc. 38] filed by Defendant Board of Trustees of the State Institutions of Higher Learning for the State of Mississippi d/b/a The University of Mississippi. Defendant seeks dismissal of Renita Gray's claim that she suffered discrimination because of her race, white.

## II. Factual Background

In 2016, Plaintiff Renita Gray left her position at Arkansas State University and was hired as Manager of Sponsor Programs Accounting at the University of Mississippi. Exhibit "A," Gray Deposition, pp. 9-10. Some seven (7) years later, in 2023, her immediate superior, Dr. Josh Gladden, the vice chancellor over research at the University of Mississippi, asked Gray to transfer to a higher position working under him on an interim basis. Exhibit "A," Gray Deposition, pp. 25-26. Gray testified that she was offered this position on only an interim basis because it was

considered too much of a jump from her previous position's job responsibilities for her to be offered the job on a permanent basis. Exhibit "A," Gray Deposition, p. 27. Based on Dr. Gladden's encouragement, Gray believed she would eventually get the job on a permanent basis. Exhibit "A," Gray Deposition, pp. 23-28. According to Dr. Gladden's successor, Dr. Greg Easson, Gray "would have been a quality candidate" for the job on a permanent basis. Exhibit "B," Easson Deposition, p. 57. Dr. Easson described Gray as being "a very good coworker," "very professional," and as a person who "knew what she was doing." Exhibit "B," Easson Deposition, p. 9.

As the new Interim Director, Gray replaced Dr. Melissa Hodge-Penn, who is black. Exhibit "A," Gray Deposition, p. 57. Dr. Hodge-Penn warned Gray about two (2) of her soon-to-be subordinates, one of whom was Ventez "Ven" Jones. Exhibit "A," Gray Deposition, pp. 31-32. Dr. Hodge-Penn had placed Jones on a performance improvement plan. Exhibit "A," Gray Deposition, pp. 32-33. Jones had a doctorate degree but was working as a research assistant, a job which required only a bachelor's degree. Exhibit "A," Gray Deposition, p. 32. Dr. Hodge-Penn outlined a huge number of performance issues with Jones, including his frequently standing outside of Dr. Hodge-Penn's door to eavesdrop on her conversations. Exhibit "A," Gray Deposition, pp. 33-47. Jones' performance was so bad that Dr. Hodge-Penn had stated that she would rather do away with Jones' position altogether than have to work with him. Exhibit "C," Young Deposition, p. 13. Jones' abysmal performance did not change when he began to work under Gray. In November 2023, Jones' stopped coming to work altogether because he reported that he had car trouble.

Exhibit "A," Gray Deposition, pp. 46-48. Gray agreed to allow him to work remotely; however, Jones would be unavailable when Gray tried to contact him at home. Exhibit "A," Gray Deposition, pp. 46-47, 71. Because she was unable to force Jones to return to work, Gray contacted her supervisor for assistance. Exhibit "A," Gray Deposition, pp. 49-50. Gray's supervisor, Dr. Easson, contacted Human Resources, which convinced Jones to return to work by threatening him with termination. Exhibit "A," Gray Deposition, p. 50.

Even when Jones would come to work, he would often sit in his car claiming that he could not find a parking place so as to avoid coming into the office. Exhibit "A," Gray Deposition, p. 99. Jones also left work without permission, and he complained about practically every directive which Gray gave him. Exhibit "A," Gray Deposition, pp. 100-102.

After Jones finally returned to work in March 2024, Gray heard through the grapevine that Jones had been to the University of Mississippi Office of Equal Opportunity and Regulatory Compliance ("EORC"). Exhibit "A," Gray Deposition, pp. 72-73. A short time later, Gray received an email from an EORC employee stating that Jones had complained about her. Exhibit "A," Gray Deposition, pp. 72-73.

EORC has not produced a formal written charge or complaint from Jones about Gray. Exhibit "D," Ussery Deposition, pp. 47-53. Jones had apparently made oral complaints about Gray just as he made complaints about his previous supervisor, Dr. Hodge-Penn. Exhibit "E," EORC Report. Jones' complaints included a claim that he was discriminated against because security

cameras had been installed on the floor where he works. Exhibit "E," EORC Report. However, Dr. Easson explained that the security cameras were installed only in the hallways because of a combination of a federal government requirement to keep certain materials located on the floor where Jones worked confidential, and because of complaints from employees that someone was going through their desk without them present. Exhibit "B," Easson Deposition, pp. 16-17. Easson testified that "I don't see how the cameras could be considered to be discriminatory." Exhibit "B," Easson Deposition, p. 17. Jones' complaints also included a claim that he did not receive a pay raise despite another employee with less seniority receiving a pay raise. Exhibit "E," EORC Report. Dr. Gladden, however, explained that he decided not to give Jones a pay raise because Jones was currently on an improvement plan. Exhibit "A," Gray Deposition, p. 68.

No witness has claimed Jones was an adequate performer. Long term employee Mickey McLaurin, who is a research administration advisor for pre-award and has been with the university since 1996, was outspoken when describing Jones. Exhibit "F," McLaurin Deposition, pp. 4, 6. McLaurin has worked with Jones since 2021. Exhibit "F," McLaurin Deposition, p. 6. At one point, McLaurin told his supervisor that if Jones continued to work for the University, McLaurin would quit. Exhibit "F," McLaurin Deposition, pp. 10-12. McLaurin testified that Jones had issues with every one of his supervisors, including Gray's successor. Exhibit "F," McLaurin Deposition, p. 7.

McLaurin's testimony was consistent with that of Gray who testified that when she asked Jones to perform a task, Jones would ask if he would be paid to perform that task. Exhibit "A," Gray Deposition, p. 102. Jones argued about 90 percent of the tasks which he was assigned. Exhibit "A," Gray Deposition, p. 103.

A fact finder could reasonably infer from reading Jones' testimony alone, that it is unlikely that discrimination could have been the cause of Jones' problems at the University of Mississippi. His previous employment history is spotty, at best. Prior to coming to the University of Mississippi, Jones had been fired from almost every other job he ever had. If Jones did not admit to being fired from a particular former job, he suspiciously could not recall the reason for his separation. For example, Jones once worked at Antonelli College but could not recall whether or not he was fired. Exhibit "G," Jones Deposition, pp. 8-9. He did recall, however, that he was "terminated," from a job at St. Jude. Exhibit "G," Jones Deposition, p. 14.

Jones worked for only six (6) months at Old Dominion, at which time it was "mutually agreed" that he was to be terminated, and he could not recall why he was terminated. Exhibit "G," Jones Deposition, pp. 17-18.

Jones was also terminated from the University of Memphis, and similarly could not remember why he was terminated from that job. Exhibit "G," Jones Deposition, pp. 18-19. He also worked at the University of Arkansas, where he was, again, terminated. Exhibit "G," Jones Deposition, p. 20.

Jones then worked selling cars at a Nissan dealership, but he left because he "wasn't selling." Exhibit "G," Jones Deposition, p. 21-23.

Jones began to work at the University of Mississippi in 2021; he was hired by Dr. Hodge-Penn. Exhibit "G," Jones Deposition, p. 25. When asked whether Dr. Hodge-Penn had discriminated against him, Jones responded repeatedly that he didn't "understand the question." Exhibit "G," Jones Deposition, p. 27. Jones admitted Dr. Hodge-Penn told him he was on a progressive discipline plan, but Jones claimed that Dr. Hodge-Penn said she had been "asked to do that." Exhibit "G," Jones Deposition, p. 28.

Jones did recall, though, that Dr. Hodge-Penn told him to attend meetings with Dr. Hodge-Penn's superior, Dr. Gladden. Exhibit "G," Jones Deposition, p. 32.

Jones admitted that Dr. Gladden talked to him about failing to give notification of tardiness and admitted that he would be more than one hour late. Exhibit "G," Jones Deposition, pp. 37-39. Jones tried to explain his tardiness by complaining about traffic and the lack of parking spaces. Exhibit "G," Jones Deposition, p. 40.

During his deposition, Jones was shown a performance improvement plan purportedly containing his responses to the plan for improvements he was to make. One entry on the form indicates that Jones had referred to the corrections as being "character assassination." Jones could not recall whether he actually wrote that statement on the performance plan. Exhibit "F," Jones Deposition, pp. 41-42.

Jones did recall that he found Dr. Hodge-Penn to be "unprofessional and unproductive," and that he expressed to Dr. Hodge-Penn that the salaries were "off quite a bit." Exhibit "G," Jones Deposition, pp. 44-45. Jones also described himself as being frustrated because he was not "allowed or encouraged to take time off," which caused him to suffer from extreme burnout. Exhibit "G," Jones Deposition, pp. 47-48. Jones complained that co-employee Lesha Agnew had taken off "all of last summer." Exhibit "G," Jones Deposition, p. 49. When asked whether Agnew

was black or white, he responded, "I don't know how she identifies," but that "she may be Native American," or she may be "other," or she may be "black." Exhibit "G," Jones Deposition, p. 50.

While Jones claims to recall having alleged that Gray had discriminated against him on grounds of gender and race, he does not recall the factual basis for such a charge. Exhibit "G," Jones Deposition, pp. 66-67.

Jones also made a complaint about pay equity but does not know who set his pay. Exhibit "G," Jones Deposition, pp. 68-69.

He complained, too, about discrepancies in workload and about remote work, but he could not identify an employee treated better than him regarding the remote work. Exhibit "G," Jones Deposition, pp. 69, 73-74.

Jones deposition testimony revealed a suspicious inability to remember anything. Regarding cameras being installed, Jones felt that there was surveillance being done for some reason, but he "never really knew the whole story." Exhibit "G," Jones Deposition, p. 74.

Jones recalled that Dr. Easson replaced Gray as his supervisor, but he did not recall whether he had problems with Easson. Exhibit "G," Jones Deposition, pp. 84-85.

He also did not recall whether he had written emails about his current supervisor, Ms. Rich. Exhibit "G," Jones Deposition, p. 85. In fact, Jones did not recall if anyone at the University had told him that he had performance problems. Exhibit "G," Jones Deposition, p. 86.

Jones lacked a knowledge of any specifics of his complaint, and his purported inability to recall anything about his work is consistent with what occurred when Plaintiff attempted to depose him. The University attorney asked Jones to appear for his deposition. Exhibit "G," Jones Deposition, p. 88. Jones agreed to come. Exhibit "G," Jones Deposition, p. 88. However, Jones then called some unidentified person at some unidentified time and stated that he would not be

present at the deposition due to personal reasons. Exhibit "G," Jones Deposition, p. 89. Jones claimed that he appeared for deposition only after a subpoena was taped to his office door at a time in his absence. Exhibit "G," Jones Deposition, p. 90. This is also false. In fact, Jones was personally served by a subpoena to be at his deposition. *See,* Exhibit "H," Subpoena on Ven Jones and return demonstrating personal service.

Although no one gave Gray any written notice of any charges or of any specific complaints by Jones, Gray was told by the EORC that she would be interviewed on April 23, 2025. Exhibit "A," Gray Deposition, pp. 139-140. Following the interviews, the EORC issued an unsigned report in which the EORC found that Gray had somehow discriminated against Jones. Exhibit "E," EORC Report. The only factual basis for this finding is a statement in the unsigned EORC report that, during the interview process, Gray said she was not "comfortable" around black people. Exhibit "E," EORC Report.

At deposition, none of the three (3) interviewers admitted to writing the statement in the EORC report which mentions Gray had said she was uncomfortable around black people.

EORC interviewer Honey Ussery testified that she did not remember whether or not she wrote the unsigned EORC report. Exhibit "D," Ussery Deposition, p. 13. Ussery also did not know if there ever existed a written complaint by Jones. Exhibit "D," Ussery Deposition pp. 13-14. Ussery further did not know whether Jones had actually written a complaint. Exhibit "D," Ussery Deposition, pp.16-17. Ussery did remember that one part of Jones' complaint was closed because of a lack of follow up by Jones, and she admitted it was "established" that Jones had performance

issues. Exhibit "D," Ussery Deposition, pp. 17-18. Ussery testified that the Jones case was actually initiated by a black employee, Billy Benson, who, for unexplained reasons, did not participate in the interview of Gray. Exhibit "D," Ussery Deposition, pp. 18-19.

Ussery knew that Gray's predecessor, Dr. Hodge-Penn, had Jones on a progressive discipline plan. Exhibit "D," Ussery Deposition, p. 20. According to Ussery, Jones had "issues" with Dr. Hodge-Penn. Exhibit "D," Ussery Deposition, p. 21. She agreed that Jones was "difficult to work with" and sent "inflammatory" emails. Exhibit "D," Ussery Deposition, p. 24. The only specific fact alleged to constitute the basis for discrimination is Ussery's claim that Gray had stated during the interview process that she was "very uncomfortable around black people". Exhibit "D," Ussery Deposition, pp. 26-29.

According to Ussery, however, this statement was related to an earlier remark where Gray told the University's Diversity Equity and Inclusion committee about a Middle Eastern employee having mistreated a black employee. Exhibit "D," Ussery Deposition, pp. 30-32. Ussery also undermined any contention that the statement about being uncomfortable indicated discrimination, because she testified that the question about being uncomfortable was a "throwaway question." Exhibit "D," Ussery Deposition, p. 30. This comment was unrelated to the issue, apparently meaning that the alleged complaint about Gray was unrelated to any charge that Gray had discriminated against Jones. Ussery then testified that Gray was "trying to figure out how better

to relate to black and nonwhite employees or black and nonwhite people". Exhibit "D," Ussery Deposition, p. 32.

According to Ussery, it did not matter whether there were problems with Jones and his performance. Exhibit "D," Ussery Deposition, p. 47.

EORC interviewer Kimbery DeVries' testimony also disclosed a lack of any factual basis for the EORC's finding that Gray had discriminated against Jones. DeVries admitted that when the EORC committee interviewed Gray about her attitude toward black employees, her response was "as a conservative Chistian, I treat everyone the same." Exhibit "I," DeVries Deposition, p. 30. DeVries also recalled Gray's explaining that she had close relatives who are black. Exhibit "I," DeVries Deposition, p. 31. DeVries admitted she knew that black former supervisor, Dr. Hodge-Penn, had written a note stating that she had rather do away with Jones' position than continue to work with him. Exhibit "I," DeVries Deposition, p. 32. DeVries was aware of emails documenting that Jones frequently questioned what Gray and others asked him to do. Exhibit "I," DeVries Deposition, p. 31. DeVries denied that she had any role in writing the EORC Report. Exhibit "I," DeVries Deposition, p. 10. Regarding Jones' pursuit of his complaint, DeVries recalls that Jones would make a complaint, then would withdraw it, and then start over. Exhibit "I," DeVries Deposition, p. 10. She knew that Jones was "challenging with supervisors" and frustrated multiple supervisors. Exhibit "I," DeVries Deposition, p. 11. DeVries testified that Gray's complaints about Jones sitting in his car without coming into work were not "within the scope" of

what the EORC was investigating. Exhibit "I," DeVries Deposition, pp. 13-15. According to DeVries, it was not the role of the EORC to decide whether Jones is a bad employee. Exhibit "I," DeVries Deposition, p. 15. DeVries did note that Gray had reported that a Middle Eastern employee had mistreated a black employee. Exhibit "I," DeVries Deposition, pp. 17-18. She recalls that Jones had complained about cameras being installed, but DeVries agreed Jones had no knowledge of who made the decision to install this equipment. Exhibit "I," DeVries Deposition, p. 24. DeVries did not remember any discussion about "treating people differently" because of race. Exhibit "I," DeVries Deposition, p. 27. Regarding the EORC report and the statement Gray had expressed in an interview that she was "uncomfortable around black people," DeVries wrote in her notes that Gray had said "very uncomfortable at a point" and Gray said that she did not have any black friends until she went to graduate school. Exhibit "I," DeVries Deposition, pp. 28-29. DeVries does not believe Gray was lying when she made the statement about treating everyone the same. Exhibit "I," DeVries Deposition, p. 30.

The third EORC interviewer was Grey Young. Exhibit "C," Young Deposition, p. 5. Young's notes of the interview contain a heading "comfort with race" and says, "very uncomfortable at a point." Exhibit "C," Young Deposition, p. 7. Young did not recall what he meant by that comment. Exhibit "C," Young Deposition, p. 7. He believed, however, that this note was written in the context of Gray's asking an employee of the University about whether to use the term African American or black when referring to persons of color. Exhibit "C," Young

Deposition, pp. 8-9. He also recalled Gray's saying that she was close to people of color. Exhibit "C," Young Deposition, p. 11. Young knew that Jones questioned Gray's authority. Exhibit "C," Young Deposition, p. 13. According to Young, it did not matter that Jones had problems with all of his supervisors. Exhibit "C," Young Deposition, p. 20.

Gray denied she told the EORC committee that she was uncomfortable around black people. Exhibit "A," Gray Deposition, pp. 156-157. Rather, Gray had said she was "very uncomfortable" about being "accused of racial discrimination" regarding "an employee that had been a troublesome employee even before" her tenure at the University began. Exhibit "A," Gray Deposition, pp. 156-157. Gray did testify that she was uncomfortable being around Jones, but emphasized that she is "totally comfortable around any other person of color". Exhibit "A," Gray Deposition, p. 157.

Despite the lack of any specific findings to support the claim that Gray discriminated against Jones, the EORC issued its report recommending that Gray be "removed from all supervisory roles." Exhibit "E," EORC Report; Exhibit "B," Easson Deposition, p. 35. Gray wrote a detailed appeal to the Provost explaining that the report was baseless. Dr. Easson and the Provost agreed that the removal of all supervising duties of Gray would be "extremely disruptive to the Office of Research" and would "cause some major issues." Exhibit "B," Easson Deposition, p. 35. Easson and the Provost decided it would create chaos to remove Gray from supervisory duties, so they agreed that they would remove Gray from only the supervising role above Jones, and that Dr.

Easson would supervise Jones. Exhibit "B," Easson Deposition, pp. 36-37. The plan was "to comply with the EORC recommendation but not harm the operations of the Office of Research" by removing Gray as supervisor. Exhibit "B," Easson Deposition, p. 42. Jones' complaint about security cameras being on the floor where he worked would be addressed by either adding security cameras to another floor or by removing the cameras on the floor where Jones worked. Exhibit "B," Easson Deposition, pp. 45-50.

Largely because of the problem Jones was causing Gray, Gray wrote Easson on July 31, 2024: "Pursuant to your directive requiring an official letter of retirement/resignation, please accept this as my notification of planned retirement as of January 31, 2025." Exhibit 15 to Easson Deposition. Dr. Easson responded by telling Gray that he was sorry that he was not able to negotiate "a better outcome for you". Exhibit "B," Easson Deposition, p. 51. Dr. Easson said that he would have liked to negotiate something to allow Gray to retire when she wanted to retire. Exhibit "B," Easson Deposition, pp. 51-52. Nevertheless, following the report, Dr. Easson had informed Gray that he needed a retirement date as soon as possible. Exhibit "B," Easson Deposition, p. 33.

Upon Gray's retirement, Easson wrote Gray as follows:

> I wanted to take this opportunity to say thank you for all your help and support this past 13 months. You were thrown into a very complicated and critical position as the Interim Director of SPA and handled it extremely well. Your knowledge and skill in leading SPA has been critical to ORSP's success in the past year…I know that your career at Ole Miss is not ending

> the way it should and I wish there was more I could do to remedy the situation. You deserve better.

Exhibit 16 to Easson Deposition.

According to Dr. Easson, except for the claim that Gray had been discriminating against Jones and the findings of the EORC, there was no reason why Gray would not have been qualified to be the new director. While it was difficult to answer whether Gray would have gotten the permanent position, Dr. Easson testified that Gray would have been a quality candidate. Exhibit "B," Easson Deposition, p. 57.

## III. Standard of Review

Summary judgment cannot be granted under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), which holds that the standards for ruling upon a motion for summary judgment and upon a motion for judgment as a matter of law are the same. In deciding either motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence . . .. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150.

Any doubts concerning whether summary judgment should be granted "are to be resolved in favor of the nonmoving party." *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV. <u>Arguments</u>

### A. Summary Judgment Should Not Be Granted Based On The Alleged Lack of An Adverse Employment Decision.

Defendant's first argument is that there was no adverse employment action because Gray "had been planning to retire for months before the June 6 report." Defendant's Brief, [Doc. 39, p. 11]. Defendant incorrectly assumes that only being forced from a job is actionable. In fact, Title VII's discrimination provision requires a plaintiff to show only that an employer "discriminated" against her because of her race with respect to the "terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).

Such discrimination encompasses more than being forced to retire. Rather, 42 U.S.C. § 2000e-2(a)(1) requires only that a plaintiff prove "some harm" from a discriminatory action. A plaintiff need not prove that the harm was "significant, serious, or something similar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 353 (2024). Even before *Muldrow* was decided, the Fifth Circuit had accurately anticipated that decision because it had held in *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 501-502 (5th Cir. 2023), that the statute covers more than "ultimate employment decisions." *Muldrow* teaches that the anti-discrimination provisions of Title VII are violated when employees are discriminated against "because of traits like race . . ." *Muldrow*, 601 U.S. at 358. Because Gray was formally removed from all supervisory responsibilities, and because she was branded with having behaved in a racially discriminatory manner against another employee, Gray suffered some harm.

Gray was not actually removed from all supervisory duties only because the University concluded that to remove her would cause "chaos" in her department. Exhibit "B," Easson Deposition, p. 36. The official University records indicate that she was indeed removed from supervisory responsibilities.

As of April 2, 2026, Gray had experienced reservations about retiring by using the phrase "if I decide to follow through with my retirement plan," and stating that "I have never left a job undone which is the only reason I may stay longer," and that "we shall see." *See*, Defendant's Motion for Summary Judgment, [Doc. 38-3, p. 145].

The University was still uncertain as to whether Gray was leaving because Marisa Zuskar wrote Gray on July 17, 2024, asking whether her "planned transition" was still planned. *See,* Defendant's Motion for Summary Judgment, [Doc. 38-4, p. 146].

In an April 17, 2024, email, Plaintiff wrote to Andrea Jekabsons:

> It is especially troublesome when an employee wants to sit in the loading dock area for an hour or more waiting for a parking place behind the building instead of walking from elsewhere. They feel them entering campus and sitting in their car counts as work time. I suggested they walk from elsewhere, but they do not feel that should be a requirement. When I requested them to turn in leave for showing up an hour late three days one week and starting the next week coming in an hour and 45 minutes late, they refused and said I didn't make others do that, which is not the case. . ..

Defendant's Motion for Summary Judgment, [Doc. 38-5, pp. 149-150].

Gray went on to relate that she had treated every employee the same, but she noted that the EORC was contacting employees and asking if she treated employees differently. Defendant's Motion for Summary Judgment, [Doc. 38-5, p. 150].

Gray's email of April 17, 2024, stated: "I was officially diagnosed with Bell's Palsy that is likely due to the stress this person places on me every single day. When they are not being passive aggressive and insubordinate, they are going to others within the office and trying to get them to join forces against me. Other employees have come to me in confidence letting me know what is going on." *See,* Defendant's Motion for Summary Judgment, [Doc. 38-5, p. 150]. Gray's "this person" comment is referring to Jones. Further in her email of April 17, 2024, Gray informed the university that she "cannot be successful in improving the research effort on this campus without

support." Defendant's Motion for Summary Judgment, [Doc. 38-5, p. 150]. Gray also explained that she needed to begin FMLA leave as soon as possible. Even while complaining about the stress, Gray still expressed reservations about leaving by saying: "Leaving a job undone is nothing I have ever done elsewhere, but now I must." Defendant's Motion for Summary Judgment, [Doc. 38-5, p. 150].

**B. There Are Issues of Material Fact As to Whether the EORC's Finding – That Gray Discriminated Against Jones And That Gray Should Be Removed From Supervisory Duties - A Finding Which Was Affirmed By The University of Mississippi Provost - Was Motivated By Plaintiff's Race, White.**

Title VII of the Civil Rights Act of 1964 sets a low bar for a plaintiff to demonstrate discrimination as outlawed by 42 U.S.C. § 2000e-2(a). Plaintiff need only demonstrate that "race…was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 658 (2020), holds that "an employer who intentionally treats a person worse because of [race] – such as by firing the person for actions or attributes it would tolerate in an individual of another [race] – discriminates against that person in violation of Title VII."

In this case, accepting non-movant's evidence as true, there was no evidence that Gray discriminated against Jones. Instead, the evidence before the EORC was that Jones was a hostile, belligerent employee who caused difficulties for all of his supervisors, not just his white supervisors. The EORC, without basis, found that Gray had discriminated against Jones despite the lack of evidence that she had done so. Whether making such a factually empty finding was based upon race depends upon the state of the mind of the decision makers. While a person's state of mind is difficult to determine, it is "as much a fact as the state of his digestion." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). That court further explained the

factual inquiry in a Title VII is "whether the defendant intentionally discriminated against the plaintiff." The court further explained:

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* at 253, 101 S.Ct., at 1093. In other words, is "the employer . . . treating 'some people less favorably than others because of their race . . .

*U.S. Postal Service Bd. of Governors,* 460 U.S. at 715.

Gray has produced substantial evidence that the EORC branded her as having discriminated against Jones, and recommended she be removed from supervisory responsibilities in the absence of any facts indicating that she had discriminated and in the absence of any facts that she had done anything to be removed from her supervisory position. The fact that the EORC found Gray guilty of discrimination, and recommended she be removed without any factual basis for that finding, should allow a reasonable jury to find that the University discriminated against Gray because of her race. No admission is required, and circumstantial evidence suffices. The United States Supreme Court in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003), held:

> We have often acknowledged the utility of circumstantial evidence in discrimination cases. For instance, in *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of *circumstantial evidence* that is probative of intentional discrimination." Id. at 147, 120 S.Ct. 2097. (emphasis added).
>
> . . . "Circumstantial evidence is not only sufficient, but also more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

*Reeves*, cited in *Costa*, gives persuasive reasoning as to why a jury should be permitted to find discrimination, if the jury finds that reasons offered by an employer are false. According to *Reeves*:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may

> be quite persuasive . . .In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material act as "affirmative evidence of guilt." . . .

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000).

In this case, Defendant's agents gave false evidence against Gray by claiming that she had discriminated against Jones and then recommended her demotion from a supervisory position based on that false evidence. Under *Reeves*, the very fact that Defendant has claimed falsely that Gray had discriminated is itself evidence of discrimination. "[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration." *Reeves*, 530 U.S. at 148.

Another way of viewing the matter is through the Fifth Circuit's "work rule." Under the "work rule," a *prima facie* may be established by showing that the plaintiff did not violate the work rule for which she was disciplined. *See, Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995), quoting that "either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly." *Green v. Armstrong Rubber Co*., 612 F.2d 967, 968 (5th Cir. 1980). In this case, Gray is charged with discriminating against Jones; yet the evidentiary materials demonstrate there was no such discrimination. Accordingly, Gray has made a *prima facie* case, because she has demonstrated that the work rule was not violated. In the absence of Defendant's articulating some reason other than race discrimination as to why it would make such a false charge, Gray has demonstrated sufficient facts from which a jury may infer discrimination.

Defendant argues that Gray did not show that she was treated less favorably than other similarly situated employees outside the protected group. Defendant's Brief, [Doc. 39, p. 14], citing *Ernst v. Methodist Hospital System*, 1 F.4th 333, 339 (5th Cir. 2021).

However, neither *Ernst* nor any of the other cases cited by Defendant, involve a situation in which an employee of one race is charging misconduct by a person of another race. In this situation, if it were simply one's word against the other, then it might be argued that the employer did not discriminate when it accepted the version of the black person over the white person. This, however, is a case in which, taken under the light most favorable to Plaintiff, the evidence reveals overwhelmingly that the black subordinate was a horrible performer, was disrespectful, was hostile, and was more harmful than helpful in getting the job done. On the other hand, Gray was an excellent employee. In this circumstance, there is no reasonable basis for finding in favor of the black employee, except that Defendant arbitrarily preferred the black employee over the white employee. The fact that the two (2) employees held different positions does not excuse Defendant; thus a reasonable fact finder could find that race, not different positions, accounted for why Gray was punished but Jones was not. *See,* Defendant's Brief, [Doc. 39, p. 14], citing *Patrick v. Walmart, Inc*., 859 Fed.App'x 687, 688 (5th Cir. 2021).

Defendant argues that Plaintiff cannot prevail and that the University is entitled to summary judgment because "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision." Defendant's Brief, Doc. 39, p. 17, quoting *Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). Defendant noted that Gray said she was "'very uncomfortable' about something during the interview." Defendant's Brief, [Doc. 39, p. 17]. However, the finding that Gray was "very uncomfortable about something," or even a factually baseless finding that Gray had stated

that she was "very uncomfortable around black people," is not evidence that Gray had discriminated. The definition of discrimination is "differential treatment." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020)(emphasis added). How Plaintiff "feels," or whether one feels comfortable or uncomfortable has little, if any, relationship to differential treatment. It is true that if Defendant made an honest mistake in finding discrimination, that mistake would not be a basis for liability. In this case, however, the evidence is such that the jury could find that this is not merely a mistake, but a pretext for race discrimination. Branding the innocent white employee as a discriminator, and directing she be removed from all supervisory positions, is an act of discrimination because it was done because Gray is white, and the complaining employee was black.

## V. Conclusion

Judge (now Justice) Neil Gorsuch, in *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016), wrote:

> Yes, today motions practice, and especially summary judgment motions practice, seems to have assumed a place near the center of the legal universe: almost no one makes it to trial anymore. With that development surely comes a strong temptation to anoint summary judgment with unique significance and adorn it with special rules and procedures. But the truth is summary judgment was supposed to be that —summary. Not a maddening maze. Not a paper blizzard. Not a replacement for the trial as the preferred means for resolving disputes.

In this case, there is before the Court a simple issue of whether there is evidence that Defendant discriminated against Gray because she was white. Summary judgment should not be a "replacement for the trial as the preferred means for resolving" this dispute.

The motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED, on July 31, 2026.

**RENITA GRAY**, Plaintiff

By: */s/ Jim Waide*
Jim Waide, MS Bar No. 6857
Rachel Pierce Waide, MS Bar No. 100420
Yance Falkner, MS Bar No. 106107
WAIDE & ASSOCIATES, P.A.
332 North Spring Street
Tupelo, MS 38804-3955
Post Office Box 1357
Tupelo, MS 38802-1357
Telephone: (662) 842-7324
Facsimile: (662) 842-8056
Email: waide@waidelaw.com
jdw@waidelaw.com
rpierce@waidelaw.com
yfalkner@waidelaw.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

This will certify that undersigned counsel for Plaintiff has this day filed the above and foregoing with the Clerk of the Court, utilizing this court's electronic case data filing system (CM/ECF), which sent notification of such filing to all counsel of record.

DATED July 31, 2026.

*/s/ Jim Waide*
**JIM WAIDE**